[Crim. No. 1791. In Bank.—December 24, 1913.]

## THE PEOPLE, Respondent, v. JERRY ALLEN, Appellant.

CRIMINAL LAW—HOMICIDE—PROOF OF CORPUS DELICTI—NECESSITY OF AUTOPSY.—In a prosecution for homicide the evidence in proof of the *corpus delicti* need not be such as an autopsy would furnish. It is enough if an eye witness testifies that the deceased fell immediately after the defendant fired a revolver; that other witnesses state that they entered the deceased's room immediately after the shot was fired and found her unconscious; and that a surgeon, who was called to attend the deceased, testifies that in his opinion death resulted from hemorrhage due to the severing of the aorta.

ID.—INTOXICATION OF DEFENDANT—EXCLUSION OF EVIDENCE CONCERNING—WHEN NONPREJUDICIAL.—In such a prosecution the defendant is not prejudiced by the refusal of the court to permit a witness who had been drinking with him on the day of the homicide, to testify as to the number of drinks the defendant had taken just prior to the shooting, if the witness is permitted to state that he and the defendant had been drinking on that day, and is allowed to give his opinion that the defendant was intoxicated, and the defendant himself, while a witness in his own behalf, is permitted to tell with great detail how often and what he had drank on that day.

ID.—MOTIVE OF DEFENDANT—EVIDENCE OF PRIOR FRIENDLY OR HOSTILE RELATIONS.—In a prosecution of a man for the shooting of his wife, evidence that the relations between them were friendly, offered to show lack of intent for the homicide, is properly excluded, where no effort has been made to show that threats had been uttered by him, or that he entertained any feeling of hostility toward her, and the only showing of a motive for the crime has been furnished by him in his testimony regarding her declaration that her affections had been transferred to another man.

ID.—WITNESS—CROSS-EXAMINATION—CHANGE OF RESIDENCE—REVOCATION OF SALOON LICENSE.—Where a witness for the defendant in a homicide case has testified on his direct examination as to the defendant's career during the four years of their acquaintanceship, it is not prejudicial misconduct for the district attorney to ask him on cross-examination whether some of the defendant's changes of residence were not due to the revocation of his saloon license.

ID.—CROSS-EXAMINATION OF DEFENDANT—SHOWING OF PRIOR MISCONDUCT.—Where the defendant in such case is asked on direct examination whether he had to give up his saloon in a certain city, to which he replies that he sold it, it is not prejudicial error for the dis-

trict attorney to ask him on cross-examination whether at the time he left such city he and his bartender were not accused of beating up a man, the jury being promptly instructed to disregard the question.

APPEAL from a judgment of the Superior Court of Colusa County and from an order refusing a new trial. H. M. Albery, Judge.

The facts are stated in the opinion of the court.

M. T. Brittan, J. W. Maddux, John D. Harloe, and John T. Williams, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THE COURT.—The defendant was tried for the murder of his wife, Sadie Allen, sometimes known as Pearl Evans. The jury returned a verdict of murder of the first degree. His motion for a new trial was denied and he was sentenced to suffer the death penalty. He appeals from the judgment.

The killing took place at Williams, Colusa County, on the night of December 25, 1912. The woman, Sadie Allen or Pearl Evans, was an inmate of a house of prostitution at that place, and her husband, the defendant, had visited her a few days before the tragedy. He testified that when he had married her, some years before that time, she had been a prostitute, but that he had taken her from that life and had supported her. He said that they had lived quite happily in various cities in which he had worked, generally as a bartender, or as a saloon keeper, and that only a short time before her death she had returned to the old life of infamy, much against his will. According to his testimony, he had purchased a place in the country and had urged her to go there to live with him. Finally she promised that she would do so after the holidays, but about that time he began to believe, from what she herself and others had told him, that she had transferred her affections to another man. On Christmas day, 1912, he went to Williams and again heard these rumors. He then proceeded to the house which she and another prostitute occupied. The other woman admitted him

and he inquired for his wife. The other woman summoned her and Allen and she met in her bedroom to which he had gone immediately after entering the house. The testimony of the witnesses regarding the occurrences immediately following this meeting is somewhat in conflict. There is no doubt, however, that after a very brief conversation between them, the defendant drew a revolver, shot his wife and then turning the weapon upon himself inflicted a wound on his head. The woman died within a very short time, but the defendant soon arose from the floor where he had fallen after he wounded himself, and departed from the house. Subsequently he was wounded by the officer who arrested him, because, as the constable said, he refused to halt when ordered to do so.

The defendant testified that at the last conversation with his wife a few days prior to December 25, 1912, it had been agreed that he would apply for employment as a bartender, and that he had been given a card of introduction to a saloon keeper at Placerville, who, he was assured, would give him a position immediately upon presentation of his credentials. He had with him this card when he went to see Sadie Allen for the last time. Shortly after his arrival in Williams he had been told by a friend that he had lost the affections of his wife and that she had bestowed them upon another man. He then made the call upon her and his own version of what transpired immediately before the killing is as follows:

"Well, I went over and knocked at the side door, and Miss Herman came to the door—Miss Fanny. I asked her— I says, 'Where is the old lady?' I think, is what I said to her. She says, 'I will call her.' She called her.

"Q. Just a moment: When you refer to the old lady, to whom do you refer? A. I refer to my wife. And I stepped into her room. I had been in her room before. I knew just what room she had. I walked into her room and she came in and we shook hands.

"Q. Now, then, tell everything that was said.

"A. I showed her this card, and I says, 'Well, I got the job.' I says, 'Are you going to go with me?' She says 'Well, no,' she says, 'I am not going with you.' I says 'I was introduced to a fellow up the street,' I says 'just a minute ago,' I says, 'which' I says, 'Jack told me is your new fellow—

some fellow' I says 'with a black overcoat.' I says 'Is that him?' She says 'Yes, that is him.' I says 'Do you mean that?' She says 'Yes, I mean that.' I says 'Why, didn't you tell me just yesterday that you would go with me?' She says, 'Yes, but I have changed my mind.' 'Well.' I says 'You know now that I am all in.' I says 'I am about broke.' I says, 'Will you give me a chance to raise a few dollars on this property, because I don't want to be in California and you living with somebody else here.' · She says, 'No, I am not going to have any mortgage on that property at all.' 'Well,' I says 'that ain't doing just about right, is it?' She says 'Well, I can't help that.' I says 'What are you going to do'—I says, 'live on that property there with this new man of yours? Is he going to finish paying for it?' She says, 'The property is mine, and I will do as I damn please with it.' She says 'Furthermore he is going to sleep here with me to-night, and you can go and get your room at the hotel.' And from that on, I don't know what came up—I suppose is when the shooting happened.

"Q. At that time you say you lost control of yourself?

"A. I couldn't tell what I did or how I talked to her. I can't express myself. I don't know how I felt. It seemed like everything was dark and dreary around me.

"Q. Well, go ahead. A. Well, I suppose I must have shot her then, and shot myself. And I got up, and the next I knew—the next was about right, I guess—was the doctor dressing my head. I don't know just what did happen."

George Waters testified that on the night in question he was washing glasses in the "wine room," a small apartment adjoining the kitchen of the house occupied by the Allen woman. The doors were open and he could see Allen and the latter's wife as they stood in her room. He testified in part as follows:

"Q. What did you first observe? What did you first see with reference to these two parties, Jerry Allen and Pearl Evans?

"A. These two parties shook hands.

"Q. You say you saw them shake hands? A. Yes, sir.

"Q. And what next did you see or hear or observe?

"A. I saw Mr. Allen hit her.

"Q. How long had Jerry Allen been in that room before you observed him strike her? A. About two minutes.

"Q. Do you know what was the reason or cause or occasion of Jerry Allen striking Pearl? A. I do not, sir.

"Q. What had they been doing after he had entered the room and shook hands with Pearl? What had they been doing up to the time of the striking? A. Talking about some affairs, I don't know what; I couldn't make out what was said.

"Q. And as to any word that was said by either of the parties between the time of the entrance of Jerry Allen, and the striking of Pearl by Jerry—any words that you heard and caught on to, can you now recall at all anything that you heard?

"A. The words, 'Don't do that, Jerry.'

"Q. Did you hear Mr. Allen—do you now recall any words that he said? A. I do not recollect, sir.

"Q. Well, you observed him strike her. What was the effect of that blow? A. The effect of the blow, she fell on her knees. She went to the floor, her knees on the floor and her hands on the bed.

"Q. What next did she do? A. She got up and went out to the kitchen.

"Q. Where were you all of this time?

"A. I have been in the wine room.

"Q. Where were you when she came out of her room into the kitchen?

"A. I was standing at the stove.

"Q. How close did she pass to you?

"A. About a foot and a half or two feet.

"Q. Where did she go?. A. She went to the back end of the kitchen door.

"Q. That was the door that would lead outside to the very back of the house? A. Yes, sir.

"Q. What did she do at the door? A. She wheeled, and the door was locked, and she wheeled and backed up against it.

. . . . . . . . . . .

"Q. Where was Jerry Allen in the mean time?

"A. Jerry Allen followed her up.

"Q. What next occurred after she had turned her back to
the door?

"A. Next occurred, Jerry Allen shot her.

"Q. At that point and at that time, do you recall whether
anything was said by either of the parties?

"A. There was, but I was too scared to make out what it
was.

"Q. You have stated.that she, having her back to the door,
Jerry having followed her out, that he shot her?

"A. Yes, sir.

"Q. How many times did he shoot at her?   A. Once.

·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·

"Q. What was the effect, that you observed, upon Pearl?
What did she do?   A. She fell to the floor.

"Q. And what was the next thing that was done by Jerry
Allen?

"A. He tried to shoot himself.

"Q. What was the effect that you observed upon him in
that trial?

"A. The effect that he fell to the floor.

"Q. How many times did he shoot altogether?

"A. Twice."

Two other witnesses who were in the front room of the
house testified that Pearl Allen exclamed "Don't do that!"
or words of similar import just before the shots were fired.

Appellant's first contention is that the *corpus delicti* was not
proven because the prosecution did not establish with sufficient
certainty the fact that the deceased was killed by the shot fired
from defendant's revolver.   It is true that there was no
autopsy, but the surgeon who was called to attend the
wounded woman testified that, in his opinion, from the course
of the bullet, the woman's death resulted from hemorrhage
due to the severing of the aorta.   Added to this was the testi-
mony of Waters that the woman fell immediately after the
shot was fired and the statements of other witnesses that they
found her unconscious when they entered the bedroom im-
mediately after the revolver had been discharged.   It did not
need the evidence which an autopsy would have furnished to
establish the cause of death.   The testimony of these wit-
nesses was quite sufficient, if believed, to justify the jury in

finding that she died as a result of the shot fired from her husband's revolver.

The next assignment of error by appellant is based upon the refusal of the court to admit certain testimony having a tendency to show that the defendant was intoxicated at the time of the commission of the alleged murder. The court did sustain certain objections to questions tending to elicit answers showing how many drinks of intoxicating liquor the defendant had taken just prior to the shooting. This was during the time when witness Warren was on the stand. However, Warren was permitted to state without objection that he and Allen had been drinking together on the day of the homicide, and, after discussing the rule contained in section 22 of the Penal Code, the court allowed the witness to testify regarding the apparent condition of Allen. The witness, Warren, swore that Allen was intoxicated and the answer was allowed to stand. We cannot see that the defendant was prejudiced by the rulings of which his counsel complain. Without objection Warren stated that he and Allen were in two different saloons, drinking, and told how long they remained in each. He also, as we have seen, was allowed to give it as his opinion that the defendant was intoxicated. This was sufficient to give the jurors an opportunity of applying to the evidence before them the rule set forth in the latter part of section 22 of the Penal Code that the "jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." Further answers were elicited from the witness on direct examination by defendant's counsel to the effect that he noticed nothing peculiar in Allen's actions at the time they were together on the day upon which the homicide occurred. The defendant, while a witness on his own behalf, was permitted to tell with great detail how often and what he had drank on that Christmas day. It will be seen therefore, that the defendant's counsel were given abundant opportunity to show Allen's condition of intoxication, if indeed he had been drinking to excess, and there was no violation of the rule that proof of drunkenness is admissible for the limited purpose set forth in the latter part of section 22 of the Penal Code, and discussed in such

cases as *People* v. *Blake,* 65 Cal. 277, [4 Pac. 1], and *People* v. *Fellows,* 122 Cal. 239, [54 Pac. 830].

Counsel for the defendant made a formal offer to prove that the relationship between Allen and his wife had been most friendly and that he had provided for her well. This sort of proof was tendered for the purpose of showing lack of intent on his part to take the life of Pearl Allen. The court thereupon sustained certain objections to questions tending to develop the facts regarding the domestic and personal relations of the couple. There was no error in the ruling. The proffered proof was too remote. No effort had been made by the prosecution to show that threats had been uttered by the defendant nor was there any evidence tending to prove a long existing feeling of hostility by Allen against the woman. The only showing of a probable antecedent motive for the crime was furnished by the defendant himself in his testimony regarding his wife's declaration that her affections had been transferred to another man. The harmony or discord in the domestic relations of the Allens was a subject which was not in issue.

The most serious question involved in this appeal arises from the alleged misconduct of the district attorney. Witness Warren, who had worked for the defendant at various places in which the latter had conducted the business of saloon-keeping, was examined quite in detail with reference to the career of Allen during the four years of their acquaintance. On cross-examination the following occurred:

"Q. . . . Do you remember the cause and occasion of Mr. Allen leaving Astoria? No, sir, I do not.

"Q. Do you know the fact to be that his license was taken away and revoked? A. No, sir, I do not, sir.

"Mr. Brittan: Now, just a moment: That is incompetent, irrelevant and immaterial and improper conduct on the part of the district attorney, and has nothing to do with this case whatever.

"The Court: It may be a question whether you didn't open the subject, or not. I am inclined to think it is rather remote.

"Mr. Brittan: Has any thing been said about a saloon license here?

"The Court: Something said about why, or the occasion of his leaving Astoria.

"Mr. Brittan: It is an insinuation, your honor, purely upon the part of the district attorney.

"Mr. Millington: I beg your pardon.

"Mr. Brittan: Nevertheless, I am going to make my objection. The only question I asked him, if he were there when Mr. Allen left Astoria, and with whom he went. He testified who went with him. Now, that was all the question that was asked in relation to that, and he was asked where they went, and he said they went to San Francisco.

"The Court: I am inclined to think the objection probably better be sustained. The matter was opened, however, in your direct examination for some cross-examination on the subject of his business there.

"Mr. Brittan: Nothing was asked about that at all.

.  .  .  .  .  .  .  .  .  .  .

"Mr. Millington: Q. And isn't it a fact that Mr. Allen and his assistant, Mr. Carson, were each under arrest upon the charge of beating a man up in that saloon at the time of his leaving, and that you remained? Isn't that a fact?

"A. I don't know.

"Q. What is that? A. I don't know anything about that.

"Mr. Brittan: Now, if your honor please, I am going to ask at least, your honor, for the protection that this defendant is entitled to in this court from the district attorney injecting in this case extraneous matters—matters which even if he knows to be a fact are incompetent, irrelevant, and immaterial, and not in any way intending to prove, and merely a matter which is by question, where that he knows that if he did have a witness that he could place upon the stand and ask the question, 'Was this man ever arrested for battery? Was he ever arrested for petit larceny? Was he ever arrested for any offense?'—that he couldn't prove it. It is not material or competent testimony, and I will ask your honor at this time for the protection which this defendant is entitled to, and to instruct the district attorney to refrain from such further conduct in this case.

"The Court: I am inclined to think the objections better be sustained. There is some question about its admissibility, however, from the way in which you opened the subject. The subject was opened by the defense. You asked about this man's knowledge as to the situation there. You afforded some

grounds for the question, but the objection better be sustained, and such will be the ruling.''

Later in the cross-examination of this witness these questions were propounded by the district attorney and the subjoined answers were given without objection:

''Q. And he didn't transfer his license at Golden Gate Avenue, did he? A. No, sir, not that I know of.

''Q. Don't you know that they were taken away from him?

''A. No, sir, I do not.

''Q. Do you know that? A. No, sir, I do not.''

Appellant's counsel assign the asking of the questions by the district attorney as misconduct demanding the reversal of the judgment of conviction. In this behalf they cite *People v. Wells,* 100 Cal. 461, [34 Pac. 1078] ; *People v. Derwae,* 155 Cal. 595, [102 Pac. 266] ; and *People v. Crosby,* 17 Cal. App. 524, [120 Pac. 441.] In the first of these cases the misconduct of the district attorney consisted of a series of improper and damaging questions having no possible relevancy to the guilt or innocence of the defendant and evidently asked for the unfair and indefensible purpose of getting before the jury a suggestion of other unlawful acts on his part. In the second case, the prosecuting officer, in the face of repeated rulings that the domestic relations of the defendant were not admissible on his trial for attempt to commit burglary, asked a question carrying the insinuation that the defendant had been guilty of incest. The Crosby case was one in which the defendant was being tried on a charge of rape. In his examination of the prosecutrix the district attorney propounded an interrogatory in which he embodied the statement that Crosby had put other girls in a house of ill fame. In these, and in many other cases which might be cited, new trials were ordered because of that which the court found to be obvious and flagrant misconduct. And in this connection it may be said that there is a great difference between that sort of misconduct which attributes to a witness the commission of an infamous offense and the suggestion by the cross-examiner that he may have been guilty of a misdemeanor. In the case at bar, there was, as the court suggested, some question whether or not the defendant's counsel had opened the door for the sort of cross-examination in which the district attorney indulged. The defense for some reason had seen fit to trace Allen through his various experi-

ences, introducing testimony that in Astoria and in San Francisco he had supported his wife and had made a home for her and her young sister. Warren's testimony had related to Allen's various movements and there was at least some ground for the theory that the witness might be questioned regarding the reasons for some of the defendant's changes of residence. When, however, the prosecution asked a question involving a suggestion of the arrest of Allen in Astoria on a criminal charge, the court sustained an objection to it. We do not find that the course of the district attorney in asking the questions quoted above amounted to misconduct, particularly in view of the instruction which the jurors received from the court in ruling upon similar questions propounded to the defendant when he was under cross-examination.

During the direct examination of the defendant his counsel took him over a series of years and the witness spoke in detail of his various places of residence and his business activities in each of them. In the course of his narrative he told of his residing for some time in Astoria where he owned and conducted a saloon. In answer to a question by one of his counsel he said that he had "quit the saloon business in Astoria." Then occurred the following colloquy between counsel and witness.

"Q. Did you have to give your saloon up? Did you sell it, or what disposition was made of the saloon?

"A. I sold it.

"Q. What did you receive for it? A. $1200."

On cross-examination of the defendant the following proceedings were had:

"Q. At the time of your leaving Astoria, I will ask you if it is not a fact that you and your bartender, Mr. Carson, each of you, were accused of the beating of a man up in your saloon?

"Mr. Brittan: To which we object as being irrelevant, incompetent and immaterial.

"Mr. Millington: Q. And if that wasn't the occasion of your leaving Astoria?

"Mr. Brittan: Now, if your honor please, let me insist. A question was asked, and I am trying to interpose an objection. Now, Mr. Reporter, I don't know—he has got the question

and another one chopped into it there. Will you please read the first question so I will have an opportunity to object to it?

" (The reporter reads the question previous to the last one.)

"Mr. Brittan: Now, to which we object as being irrelevant, incompetent and immaterial.

"The Court: I am inclined to think that the question is objectionable.

"Mr. Brittan: Certainly.

"The Court: Of course, something was said about his leaving that place, and I am not sure as to whether something was said about what happened when he left the place, but I am inclined to think this is objectionable, and that the objection better be sustained.

"Mr. Brittan: Now, if your honor please, I also want to add to the objection that I assign it as error upon the district attorney's part to make any such statement, he knowing that it is not in accordance with law; that he knew that the question was objectionable at the time that he asked it, and he asked it for no other purpose than to prejudice this jury against the defendant in this case, And I ask at this time, now, that your honor instruct this jury to pay no attention to the remark that was made—the question asked by the district attorney.

"Mr. Millington: I am perfectly willing for any such instruction, because I know that the jury is intelligent enough not to receive anything as evidence that may be said by either attorney.

"The Court: The jury will understand that any questions stricken out, or testimony stricken out, is not for the consideration of the jury.

"Mr. Millington: In my own justification, I wish to say that I asked it solely for the answer of the witness to the effect that he sold his property up there for cash, indicating the amount, and going into the details of the transaction.

"The Court: You are entitled to ask about that."

The question was not altogether indefensible as cross-examination. The witness had been asked on direct examination "Did you have to give up your saloon?" and had explained that he had sold it, and there is at least room for argument that it was legitimate cross-examination, therefore, to ask him the impelling reason for disposing of the property. There are

many authorities justifying the cross-questioning of a witness upon matters about which he had been interrogated on direct examination and in some of them the questions have been approved even when their tendency was to develop the commission of other offenses by a defendant who had taken the stand in his own behalf. (See *People* v. *Freshour,* 55 Cal. 376; *People* v. *Crowley,* 100 Cal. 480, [35 Pac. 84]; *People* v. *Gallagher,* 100 Cal. 473, [35 Pac. 80]; *People* v. *Dole,* 122 Cal. 491, [68 Am. St. Rep. 50, 55 Pac. 581]; *People* v. *Glaze,* 139 Cal. 159, [72 Pac. 965]; note to *Evans* v. *O'Connor,* 75 Am. St. Rep. 338.) Therefore we cannot say that as matter of law the district attorney went deliberately outside of the record for the purpose of injuring the man on trial. The admissibility of the questions was a matter about which lawyers might reasonably differ. The court, however, very properly resolved in favor of the defendant the doubt which was entertained and instructed the jury to disregard the question and the suggestion contained in it. In the present case the injury, if any, arising from the cross-examination was cured we think by this prompt action on the part of the court. We are the more constrained to this conclusion because the worst injury that the questions could have inflicted upon the defendant would have been to arouse the belief in the minds of the jurors that he had used physical violence against a man; but previously, under examination by his own counsel, while emphatically denying that he had struck his wife just before he killed her, he stated that upon one occasion he had slapped her. Such testimony would have had a far more potent effect in establishing before the jury his character as a man of violence than the suggestion that he had beaten a man.

No other alleged errors are assigned by counsel and our careful examination of the record has revealed nothing which would require a reversal of the judgment.

The judgment is affirmed.

Beatty, C. J., does not participate in the foregoing.