[Crim. No. 1989. Third Dist. May 7, 1947.]

THE PEOPLE, Respondent, v. BERNIE BJORNSEN, Appellant.

W. V. Anderson and H. J. Tye for Appellant.

Fred N. Howser, Attorney General, and Jas. O. Reavis, Deputy Attorney General, for Respondent.

THOMPSON, J.—The defendant was charged with murdering Leland F. Martin on April 11, 1946. He was tried by

the court sitting without a jury. The evidence was circumstantial with the exception of several extrajudicial statements which were made by the defendant. He was convicted of murder of the first degree and sentenced to life imprisonment. A motion for new trial was denied. From that judgment and order this appeal was perfected.

The defendant and the deceased had been friends and associates. They drank liquor together. They lived on a small island in the San Joaquin River near Stockton. On the day of the homicide they started to drive to town in the defendant's automobile. When they reached Paradise Point Inn a dispute arose over the deceased's proposal to stop there. The defendant refused to do so. The deceased reached over and turned off the ignition switch. The car stopped and he got out. The defendant drove on to town without him. About six o'clock that evening the defendant returned to the island and went to bed. The deceased arrived about nine o'clock the same night. They drank some liquor together and then quarreled over their separation at Paradise Point. The defendant kept a single barrel 20-gauge shotgun and a box of loaded cartridges in his room. There was no other gun on the premises. There were no witnesses to the affair other than the two men who participated in it. No other person was on the island. The deceased was shot twice at short range with defendant's gun. Evidently he was first shot in the stomach, and then, after the shell had been extracted from the gun and the gun reloaded, he was again deliberately shot in the head, blowing a gaping hole in the skull. A medical expert witness testified that the wound in the abdomen would have knocked him down, and that the head wound would have instantly killed him. The deceased was evidently shot outside the cabin near the walk, for an empty shell and a two-inch piece of his skull were found there. Also there was a spot near the walk where the body evidently lay, from which surface dirt had been recently removed, with the possible purpose of disposing of the mess of blood and brains. Several yards of logchain and two heavy weights, taken from the warehouse on the island, were attached to his body with baling wire, and he was thrown into the river. A triangular three-foot piece of canvas was taken from the porch awning of the cottage, with which the body was either wrapped or upon which it was dragged to the boatlanding. The body was discovered some distance from the island eight days later. The

motorboat which the deceased had used to return to the island was set adrift. It was picked up the day following the homicide one and one-half miles below the island. The court found that the defendant wilfully and deliberately killed the deceased, and attempted to conceal the body and evidence of the murder. There is an abundance of evidence to support that conclusion. There was no other person who could have committed the homicide. Self-defense is not involved. The defendant merely claimed that he did not kill the deceased.

The only issue of merit on appeal is the question as to whether the defendant was so intoxicated at the time of the homicide that he was incapable of premeditating or deliberating the commission of the crime. The defendant argues that he was too weak and incapacitated from delirium tremens to have committed the homicide or to have disposed of the body. Those were problems for the determination of the trial judge, with which we may not interfere since there is very convincing evidence that the defendant not only could, but that he actually did, commit the homicide and cunningly dispose of the body. After a chain of incriminating circumstances had been adduced in evidence at the trial, the defendant was called and merely asked his age, his weight, and the one question, "Did you kill Leland F. Martin?" to which he replied that he did not. On cross-examination answers to all material questions were avoided by a claim of amnesia resulting from intoxication. He asserted that the same lapse of memory existed regarding the details of his several former extrajudicial statements. We think the court correctly ruled upon all objections regarding such testimony and that the judgment is adequately supported by the evidence.

Since the judgment of conviction is dependent very largely on circumstantial evidence, it becomes necessary to recite in greater detail some of the essential facts of the case.

Mr. and Mrs. E. R. Crowell owned a ranch about fifteen miles from Stockton, on the northerly side of the San Joaquin River in the Empire Tract. A deep water channel had been constructed in the river from Stockton to Suisun Bay. In so doing a small twenty-acre piece of land was severed from the northerly end of Tinsley Island opposite the Crowell property. A strip of water several hundred feet in width intervened between that island and the mainland on the northerly side. The severed portion of the island was erroneously called Ward Island. The real Ward Island is

located just above Tinsley Island. We shall refer to the little severed portion which is involved in this case as Crowell Island, to avoid confusion. It also belonged to the Crowells. It was covered with small trees and brush to the margin of the water and surrounded by tules. It contained a group of buildings near one end of the island, and a few yards from the water, consisting of a cottage, a warehouse and a small shack. Adjacent to the buildings a garden was cultivated. A pathway led from the buildings to the river's edge where a dock was constructed for landing boats. Across the expanse of water on the northerly side, Mr. Crowell also maintained another wharf, where he usually kept several boats including a cat-fishing boat and an outboard motor boat, for crossing the river and for going back and forth to the island. Ashley Ferry crossed the river about two miles from the Crowell property.

The deceased, Leland F. Martin, was Mrs. Crowell's brother. He was unmarried. He weighed 140 pounds and was 49 years of age. He usually worked as a farmhand. For several years he was engaged as caretaker of Crowell Island. He lived in the cottage on that island and took care of the buildings and garden. The warehouse contained old machinery and accumulated junk, including the weights and logchain which were attached to the body of the deceased before he was dumped into the river. The defendant, who was forty years of age and weighed 118 pounds, was an acquaintance of the deceased. They occasionally associated and drank liquor together. A few days before the homicide, with the consent of Mr. Crowell, the defendant went to live with the deceased on the island. He lived in the little shack, where he kept the shotgun and cartridges previously mentioned. The deceased lived in the cottage. There is evidence that several empty wine jugs were also found in defendant's room after the homicide. The defendant owned an automobile which he usually parked on the levee on Crowell's side of the river. No other person lived on the island, and except for the Crowell family and their immediate friends, other people rarely visited the island. It was commonly called the "hide-out."

About eleven o'clock in the forenoon of Thursday, April 11, 1946, the defendant and the deceased started to drive from the levee to town in defendant's automobile. The roadway ran from the levee across the Empire Tract past the

home of Mr. and Mrs. Baeta. They stopped at the Baeta house, and Mr. Martin borrowed from Mr. Baeta the sum of $5.00. Mrs. Edith Baeta knew both the defendant and the deceased. She saw them at her home that morning. Between five and six o'clock that evening she saw the defendant returning alone in his car and going toward the Crowell landing on the levee opposite the island. There can be no doubt the defendant returned to the island about six o'clock Thursday evening. He admitted that he returned to the island that evening and that he went to bed there. In an extrajudicial statement made by the defendant he said that when they reached Paradise Point Inn on their way to town, the deceased insisted on stopping and having a drink, but that he said, "No, we won't stop." He declared that the deceased then reached over and turned off the ignition switch, stopped the car and got out, and that he went on to town alone, and subsequently drove back to the levee and crossed to the island that same night. There is no doubt that Mr. Martin was at Paradise Point Inn Thursday afternoon and that he returned to the island about nine o'clock that night. Mr. William Oberly testified that he saw Martin at the Inn and asked him to have a glass of beer with him, which he refused, saying "He had enough to drink." When Oberly was asked if he seemed intoxicated, he replied "Absolutely not." Between eight and nine o'clock that evening Oberly took the deceased back in his automobile and left him at the Ashley Ferry. Oberly testified that Martin was then on his way back to the island. The defendant admitted the return of Martin that night, and told of a dispute between them. He stated: "I got back Thursday night and I was in bed and he come in and he woke me up, and we sat there and drank for quite a while. . . . I know we were arguing, I suppose it was, and he was mad because I had left him at Paradise Point and gone on to town alone."

Mr. Crowell went to the island about three o'clock Thursday afternoon, after the defendant and Martin had left to go to town. There was then no one on the island. Crowell went to prepare to paint the interior of his cottage. He left the island prior to six o'clock, before the defendant returned. Crowell did not go to the island on the following day, Friday, but he did return on Monday the 15th. He then went to the shack and talked with the defendant. He said that the defendant appeared to have been drinking, but that he talked

intelligently and answered his questions. Crowell said that he then saw defendant's shotgun in the corner of the room and the box of shells on the table. He missed Martin and asked the defendant where he was. The defendant falsely replied that he did not know, that the last time he had seen Martin was when he left him at Paradise Point Inn. Crowell then had no intimation that Martin had been murdered. He was complaining of having to hire a boat to get over to the island. He said, "Funny a man's got a boat here and he's got to go hire a boat to get on the island." The motor boat was then gone. Crowell left the defendant on the island when he departed that night. He returned to the island on the following days of Sunday and Monday, to resume his painting of the cottage. Neither the defendant, Martin, nor anyone else was on the island on either of those last mentioned days.

On Tuesday morning, April 16th, Richard Hamel, a friend of the Crowells, visited the island and he then saw the defendant sitting on a log in the yard near his shack. The defendant told him he had had "an awful night," and that he "vomited all night." Hamel told him his stomach was upset and needed something substantial in it. He offered to prepare some coffee and eggs for him. The defendant ate the eggs and drank the coffee. Hamel then asked him what in the world had become of Martin. The defendant falsely replied, inconsistent with the previous statement which he made to Crowell, that "I don't know. . . . He borrowed $5.00 from me *and took off in the boat* for Paradise Point." Evidently the defendant was trying to create the impression that Martin had gone alone in the outboard motor boat to Paradise Point, and had fallen overboard and was drowned. The motor boat had been set adrift from the island. It was found floating on the river two or three miles below the island. Mr. Fraser, who lived on Ward Island, discovered the body of the deceased on April 19th, floating on the surface among the tules eight hundred feet or more from the island. On cross-examination of the defendant at the trial, he was asked if he did not remember making a statement at the hospital on April 20th in which after he was told that they had found the motor boat below the island and had discovered the body on April 19th floating in the river, he immediately replied, "The hell. Jesus Christ. Drowned, huh?" This colloquy occurred in that regard:

"Q. They found his body. A. They did? Q. Yes. A. Where? Q. Over there by Light 11. A. *The hell. Jesus*

*Christ. Drowned, huh?* Q. No. Shot with a shotgun. A. Shot? God! Whew! My God, how did that happen? Q. Can't you tell us? A. No. Hell, we were both rumdum, crazy rumdum. I don't know how the hell it happened."

To the succeeding inquiry, "Do you remember that?" the defendant replied, "No, I don't remember."

When Mr. Hamel left the island on Tuesday, April 16th, he took the defendant with him, having persuaded him that he should go to the hospital for treatment. The defendant entered the county hospital on the last mentioned date, where he remained until April 22d, when he left that institution. He was arrested for the murder that same day.

When the body was discovered, the logchain and two heavy weights were found attached to it with baling wire. The chain and the weights were hanging down beneath the body which was floating in water about three feet in depth. Crowell and others recognized the logchain and door weights, which had been taken from the warehouse on the island, as belonging to him. The officers, Crowell, Hamel and others, then visited the island and made a critical examination. They found defendant's shotgun, and a box of cartridges in his room in the cabin. They also found that the chain and weights were gone from the warehouse. They discovered the point near the pathway where the surface of the soil had been recently removed, and at a little distance therefrom the two-inch fragment of the skull which was picked up was afterward found to exactly fit the aperture in the dead man's skull. They also found the empty cartridges near that pathway, and observed that a piece of canvas had been either cut or torn from the awning hanging from the cottage porch.

Roger Green, a member of the California Criminal Identification and Investigation Division, examined the gun, the cartridges, the shot contained therein and the baling wire. He testified that the small shot which had been extracted from the body of the deceased were exactly the same size, type and make as those contained in the loaded shells found in defendant's cabin. He called them number $7\frac{1}{2}$ chilled or hardened shot, and said that the shells contained 345 shot to the load. He examined the caps in the discharged shells and in the loaded ones and experimented by firing from defendant's gun one of the loaded shells, and testified that the shells found near the pathway were fired from that very gun. The firing pin of the gun had a slight distinguishing mark

found in the cap of the empty shell. The firing pin also contacted the cap slightly off center. He also said the piece of baling wire had been recently cut by an ax, a hatchet or some sharp instrument from another piece of the same wire, for it had a fresh, smooth surface at one end. The evidence showed that Crowell had on the island a quantity of similar size and type of wire.

A post-mortem examination disclosed the fact that Leland Martin died as a result of the gunshot wounds previously mentioned, and that he had been dead five or six days when the body was recovered.

From the foregoing facts and other relevant evidence which the record contains, there can be no doubt that the defendant deliberately shot and killed the deceased with his single barrel twenty-gauge shotgun, and that he shrewdly planned and carried out the loading of the body with heavy weights and the dumping of the body into the river, for the purpose of concealing his crime. The disposition of the body and the removal of the surface dirt and other evidence of the homicide may have been accomplished the night of April 11th, or the defendant may have completed that job the following day, for no person visited the island on Friday the 12th.

We are of the opinion the facts and circumstances of this case warranted the trial court in finding that the defendant was guilty of murder of the first degree. It is, of course, necessary that the facts and circumstances of a homicide case shall disclose substantial proof or reasonable inferences of malicious, deliberate and premeditated killing of the victim, before he may be found guilty of first degree murder. But it is not necessary that there shall be ''express evidence of a deliberate purpose to take the life of another. It is sufficient if the facts and circumstances surrounding the commission of the offense reasonably warrant an inference to that effect.''

██ The question of the degree of the crime is one exclusively for the determination of the trial judge or jury, and his or its conclusion in that regard will not be disturbed when there is any substantial evidence to support it. (*People v. Smith,* 15 Cal.2d 640, 648 [104 P.2d 510].) ██ To support a judgment of murder of the first degree it is not necessary to show personal enmity on the part of the defendant toward deceased. (*People* v. *Cornett,* 61 Cal.App.2d 98, 106 [141 P.2d 916]; *People* v. *Fleming,* 218 Cal. 300, 309 [23 P.2d 28]; *People* v. *Sainz,* 162 Cal. 242 [121 P. 922]; 13 Cal.Jur.

591, § 11.) Upon a trial for murder, the commission of the homicide by the defendant having been established the burden rests upon the accused person, in the absence of evidence adduced by the prosecution tending to show that the killing was justifiable or excusable, or that it amounts only to manslaughter, to prove the circumstances in mitigation or excuse (Pen. Code, § 1105; *People* v. *Spinelli,* 14 Cal.2d 137, 142 [92 P.2d 1017]; *People* v. *Cornett, supra.*) In the Spinelli case, *supra,* quoting with approval from *People* v. *Johnson,* 203 Cal. 153 [263 P. 524], it is said:

" 'The ruthless disposition of the body of the deceased, following the killing, certainly is some evidence of an abandoned and malignant heart upon the part of the slayer. However this may be, section 1105 of the Penal Code provides that "the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." The defendant offered no proof to meet the burden which the law casts upon him and as there was no claim of justification or excuse offered for the killing of decedent or pretense that the proof tended to show that the crime committed only amounted to manslaughter, the crime was murder of the first degree.' "

In the present case, while the defendant did positively deny that he killed Martin, it may reasonably be said he claimed that if he did kill him he was excusable for the homicide because he was so intoxicated that he did not know what he was doing, and that he had no recollection whatever of that homicide. We shall discuss that feature of the defense later.

With relation to the elements of deliberation, premeditation and malice, there are proved circumstances in this case which clearly indicate that those elements are adequately supported. In the extrajudicial statements which the defendant made he repeatedly said that they were quarreling about the defendant leaving Martin at Paradise Point and driving away without him. The defendant kept his gun in his cabin. The homicide took place outside that house near the walk. The defendant had to either follow Martin out of the cabin to the scene of the homicide, or he had to procure the gun and go out there to meet him. The gun was a single barreled

shotgun. The deceased was shot twice, once in the stomach and again in the head. Before the second shot was fired the defendant was required to extract the discharged cartridge, and reload the gun. When he left the cabin with his gun, he must have thoughtfully taken the precaution to carry with him additional loaded cartridges. We think those circumstances sufficiently supply the necessary proof of premeditation, deliberation and malice, to support the determination of the trial judge that he was guilty of murder of the first degree.

When it appears that the deceased was deliberately shot twice, or killed with a deadly weapon without sufficient provocation, under circumstances indicating that the act was performed by the defendant with an abandoned and malignant heart, as it does in the present case, malice may be presumed. (Pen. Code, § 188; *People* v. *Cook*, 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Larrios*, 220 Cal. 236, 252 [30 P.2d 404]; 13 Cal.Jur. 683, § 72.)

The question of the intoxication of the defendant was competent for the court to consider under all the circumstances of the case in determining the motive or intent with which the homicide was committed, whether he was incapable of premeditating or deliberating the performance of the act, or to understand the nature of his extrajudicial statements, and to ascertain the degree of the crime. (Pen. Code, § 22; *People* v. *Keyes*, 178 Cal. 794, 797 [175 P. 6]; *People* v. *Sainz*, 162 Cal. 242 [121 P. 922]; *People* v. *Allen*, 166 Cal. 723, 729 [137 P. 1148]; *People* v. *Flores*, 15 Cal.App.2d 58, 67 [58 P.2d 1311]; *People* v. *Boggs*, 12 Cal.2d 27, 37 [82 P.2d 368]; *People* v. *Montezuma*, 117 Cal.App. 125 [3 P.2d 370, 4 P.2d 285]; 13 Cal.Jur. 622, § 31. While there is evidence in the present case of the intoxication of the defendant before and after the commission of the homicide, there is ample proof that he was not so drunk that he was incapable of planning and executing the crime, and of shrewdly disposing of the body. He was seen, on the evening of the homicide, driving his automobile back to the levee from which he crossed to the island. He said that he returned and went to bed in his cabin. He deliberately took the gun and cartridges from his room and went out to kill the deceased. After firing the first shot into the body of his victim, he reloaded the gun and shot him again. He procured and attached the chain and weights to the body and dumped it into the river. He took the canvas from the awning to remove the body. He removed the sur-

face soil which evidently contained the blood and brains of his victim. He set the motor boat afloat and suggested that the deceased was drowned. He made several statements to various persons at different times which indicated that he understood their inquiries perfectly and answered intelligently. That furnishes ample evidence to support the court's determination that he was able to understand the nature of his act, and that he was capable of premeditating, deliberating and executing the crime, and of concealing the body of his victim.

 The court did not err in refusing to strike out the evidence of Clarence Crawford, the deputy sheriff, with relation to a voluntary statement made by the defendant on April 22d, after his discharge from the hospital, and after his arrest, while they were on the way to the county jail. Crawford testified from notes of the conversation which he made immediately after it occurred. The witness said:

"On this particular instance I asked Bernie why he did a thing like that, referring to the date in question in the shooting, and he stated that 'I don't know why I did it. I guess I must have been crazy. . . . We were arguing and I remember Lee [Martin] come at me. I can't remember anything after that.' "

The defendant's attorney moved to strike the statement from the record on the ground that it was merely "an accusatory statement," rendered incompetent under *People* v. *Lapara*, 181 Cal. 66, at page 71 [183 P. 545]. The motion was properly denied. That statement was not a confession of guilt. But it was an admission that he shot the deceased, and that he remembered "we were arguing." He did excuse the act by saying, "I guess I must have been crazy." The admission was competent as evidence tending to show who killed the deceased, and that some controversy existed between them before the commission of the homicide. In the Lapara case a similar question was held to be incompetent because the defendant in that case promptly and definitely denied the killing. His answer was, "I did not kill him." The court properly said in that case, "But if he promptly and fully deny the charge, *the accusatory statements, standing alone,* are not in any sense competent evidence of the defendant's guilt." (Italics added.) At the trial of this case the defendant did afterward declare that he did not kill

Martin, and he then claimed that he had no recollection whatever of the homicide. Even if the motion to strike out the preceding statement had been granted, it would have been competent to subsequently offer it to impeach the defendant by showing that he previously made that statement which is in conflict with his testimony at the trial. We think the ruling was correct.

█ Objections to defendant's offer in evidence of hospital records of his case while he was an inmate of that institution on three previous occasions, in February, June and August, 1945, seven months before the homicide, were sustained on the ground that they were incompetent, irrelevant, and too remote. The records showed that he had been treated at the hospital for a liver complaint and dysentery. They were offered as an exception to the rule of hearsay evidence, as proof of his physical inability to commit the homicide or to dispose of the body. The witness, Doctor Carl Meehan, acting superintendent of the hospital, had never examined or treated the patient. He had no personal knowledge of his ailments or physical condition. He had no part in making the hospital records in question. The objections were properly sustained. The evidence of entries in the hospital records was incompetent, irrelevant and too remote. (*People* v. *Boggess,* 194 Cal. 212, 235 [228 P. 448].) The question of the competency, relevancy or admissibility of evidence on the ground of being too remote, is ordinarily subject to the sound discretion of the trial judge. (*People* v. *Arrangoiz,* 24 Cal.App.2d 116, 118 [74 P.2d 789].) Even though a hospital record may be competent under proper circumstances, it may still be irrelevant because it is too remote. We may not say, as a proposition of law, that the court abused its discretion in excluding the said records under the circumstances of this case. It does not appear that the defendant was prejudiced by that ruling.

The defendant subsequently offered in evidence the hospital chart of his case upon his last entry in that institution, from April 16th to April 22d, when he left the hospital, to show that he was "suffering from delirium tremens" during that period of time. That offer was made as proof of his contention that he was incapable of premeditating or committing homicide or of disposing of the body on April 11th, or of making the binding extrajudicial admissions against interest which were testified to at the trial. It was

stipulated at the trial that the record contains the entry, "Final diagnosis, delirium tremens," under date of April 16, 1946. That stipulated fact was accepted in evidence. Upon that stipulation the record was excluded. It was not contended the record contained any other entry bearing upon the issue with respect to defendant's ability to commit the homicide or his responsibility for the admissions against interest. We may assume the last mentioned hospital record was admissible and competent evidence, as an exception to the rule with regard to hearsay evidence (Code Civ. Proc., § 1953f; *Loper* v. *Morrison,* 23 Cal.2d 600, 608 [145 P.2d 1]; *McDowd* v. *Pig'n Whistle Corp.,* 26 Cal.2d 696, 700 [160 P.2d 797]; 32 C.J.S. 633, § 728), provided the proper foundation for its reception was established, which is doubtful, but immaterial. Regarding the preliminary foundation which must be proved to entitle hospital records to be admissible in evidence, it is said in 32 Corpus Juris Secundum at page 634, that:

". . . There must be compliance with statutes under which they are sought to be introduced; it must appear that entries were made in the ordinary course of business *by persons whose duty it is to make them; they must be made contemporaneously with the fact to which they relate* or within such time thereafter as to be part of the transaction; must refer to matters which the persons making the entries have the duty to record; and *must be duly authenticated. . . . They must 'have been made by a person having knowledge of the facts set forth or one competent to predicate a medical and scientific opinion on the facts."* (Italics added.)

Some of the elements referred to in the preceding quotation, necessary to lay the foundation for the introduction of the last mentioned record, appear to be absent in the present case. It was not authenticated. But, as we have said, that may be immaterial since the essential fact sought to be elicited was stipulated. The defendant was not prejudiced by the court sustaining the objection to the record itself, since it was stipulated that it showed that the condition of the defendant, while an inmate of the hospital from April 16 to April 22, 1946, included the entry that it was diagnosed as "delirium tremens." This case was tried by the judge sitting without a jury, and the facts were all before the court.

The court did not err in restricting the cross-examination of Doctor Meehan regarding the defendant's condition

while he was an inmate of the hospital on that occasion. He stated that he had not seen the patient and that he had no personal knowledge of his mental or physical condition.

Delirium tremens is accompanied by temporary aberration of the mind from brain disorder caused by protracted and excessive use of alcoholic liquor. It is accompanied by hallucinations, violent actions, feeble pulse, shattered nerves, trembling of the muscles, particularly of the hands, arms and tongue, so that the victim is unable to articulate or talk coherently. In ordinary cases the symptoms abate in from three to six days. (7 Encyclopedia Britannica, 14th ed., p. 167.) ▇▇▇ The homicide which is involved in this case was committed five days before the defendant went to the hospital. In the meantime, several men saw and talked with the defendant and they testified to those conversations. Apparently he was then able to talk rationally and coherently. While each of them said that he appeared to have been drinking, no witness suggested that he was suffering from delirium tremens. Nor do the related conversations indicate that he was so intoxicated that he did not fully understand and intelligently answer questions. In fact, the circumstances of the homicide and manner of disposing of the body strongly indicate careful planning and complete knowledge of the entire transaction on the part of the defendant. It was the province of the judge to determine from all the facts and circumstances, including the conversations and the stipulated entries in the hospital record, whether the defendant was so incapacitated from intoxication or delirium tremens that he was not responsible for his acts, conduct or admissions against interest. Those issues were determined adversely to the' defendant. Those conclusions are adequately supported by competent and convincing evidence.

▇▇▇ The court did not err in permitting the cross-examination of the defendant, to test his recollection of the homicide, and his memory of the extrajudicial statements made by him. He denied killing the deceased, and declared that he did not remember what statements he had previously made regarding the homicide. The defendant's admissions against interest, previously made in two extrajudicial statements taken by a court reporter and transcribed, were competent for impeachment purpose. Portions of those statements were read to the defendant at the trial by the district attorney who conducted the original inquiry. The officer

testified that he personally recalled each question and answer and said they were correctly transcribed, and that the defendant so stated. Before reading them in court the foundation required by section 2052 of the Code of Civil Procedure was first laid by relating the times, places and parties present. The statements were not handed to the defendant to read. The attorney was not asked to do so. It was not contended they were inaccurately read to the witness. It was not necessary to hand the statements to the defendant. They were not signed by him. The witness declared that he did not remember making any such statements. When a witness testifies that he does not remember his previous statements, it is competent to prove them for the purpose of impeachment. (*People* v. *Vatek,* 71 Cal.App. 453, 474 [236 P. 163]; *Ehat* v. *Scheidt,* 17 Cal.App. 430, 436 [120 P. 49]; 27 Cal.Jur. 164, § 137.) It has been said the language of section 2052 that, "If the statements be in writing, they must be shown to the witness before any question is put to him concerning them," applies only to written statements signed by the witness, and not to unsigned memorandums or statements made by other parties. (*People* v. *Talman,* 26 Cal.App. 348, 351 [146 P. 1063]; *People* v. *Young,* 70 Cal.App.2d 28, 35 [160 P.2d 132].) The defendant was not prejudiced by failure to hand him the statements from which the officer read.

For the reasons previously assigned, the defendant's motions for dismissal of the action and for a new trial were properly denied.

We are of the opinion there was no miscarriage of justice in this action.

The judgment and the order denying a new trial are affirmed.

Adams, P. J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied May 21, 1947, and the opinion was modified to read as above.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1947. Carter, J., and Schauer, J., voted for a hearing.