SHEPARD, Acting P. J.
This is an appeal by defendant from a judgment of conviction of second degree murder and from an order denying a new trial.
Facts
In substance, the facts shown by the record are as follows: At their home in Buena Park, in the early morning hours of July 4, 1961, after defendant’s wife, Rosalee, had gone to bed, he killed her with a shot from a 22-caliber rifle. The bullet entered the neck about 2 inches below the right jawbone and ranged up through the opening for the spinal cord into the skull, penetrating the base of the brain. ' Her death occurred between 3 and 4 a. m. The claimed defenses are accident and drunkenness precluding intent.
Defendant testified that about 7:30 or 8 p. m. on July 3, 1961, he and Rosalee went to a neighborhood party at the Callaway home, across the street from the Greenlee home; that he had one drink of rum and root beer before going and another on arrival and four or five later; that there were several other persons at the party; that they had hamburgers about 8 :30; that later he missed Rosalee, found her in the house with Callaway’s arm around her, became enraged, engaged in an altercation with Callaway, threatened to beat up Callaway, was in turn threatened by Callaway with a fork, retreated and was threatened by Mrs. Callaway with a butcher knife; went back to his own house, found Rosalee was there, engaged in an argument with her, drank a beer, gave physical vent to Ms anger by throwing the beer can down the hall and a candle against the wall; pulled the bed covers off his wife, inferentially accused her of iufidelity with Callaway, went to another neighbor’s house, had another drink of whiskey at the house of Byrnes, a neighbor, engaged in an argument with the people there, said they wouldn’t think it so funny if Rosalee committed suicide, walked back to Ms house with Byrnes, drank another beer, had an altercation with Byrnes, was knocked down, went back to Byrnes’ bouse, bad another *695 drink and further argument, doesn’t remember going home but does remember playing records, standing in the bedroom with his rifle; that he pulled the rifle trigger; it exploded; he told his wakened children to go back to bed, left the house, drove around, thought of the possibility that Rosalee had been shot, went back home, saw a mark on Rosalee’s cheek, drove away, threw the gun out of the car, went to his sister’s house and then to the hospital, asked for Dr. Gregory, told nurses that his wife had been shot, went to the coffee room with a nurse, had coffee, told her he had shot his wife, was arrested as a drunk, was later interrogated by the officers about Rosa-lee’s death, lied to the officers saying Callaway raped Rosalee, had further talks with the officers, does not remember firing a second shot on their front porch; that Rosalee had been a good wife and mother and that he had never suspected her of infidelity; and that he doesn’t know why he got out the rifle and the shells. He denied pointing the rifle at Rosalee while on a trip in Mexico; denied threatening her with it while living at Seal Beach; denied having the rifle taken away from him by a neighbor at that time; denied threatening Rosalee with the rifle at Anaheim.
Of the other witnesses on the subject of intoxication, Mrs. Byrnes says the defendant was intoxicated, but relates in detail defendant going back and forth three times from the Byrnes home to the Greenlee home apologizing for creating a disturbance, the lights being on in the Greenlee home, hearing something like a shot and defendant driving away in his truck. Patricia Hawkins said he was very intoxicated at the party after midnight. Mrs. Dennenmeyer, at 3:45 a. m. in the coffee shop at the hospital, termed his coordination poor, hands shaky, “sort of staggering”—no opinion on intoxication. Mrs. James said defendant gets violent when intoxicated; Mr. James said the same. Pierce said most of the people at the party were drinking, including defendant. He thought defendant partially drunk; Mrs. Dagenais said he was intoxicated at Dagenais’ house 12 to 2 a. m. Mrs. O’Reilly, a nurse, first thought him intoxicated at 3 :45 a. m.; later she was in doubt. Callaway said defendant was drinking steadily all evening. Mary Duncan, a nurse, said he was, at 3 :45 a. m., agitated, nervous, flushed, not sloppy drunk. Bertha Shaw said that at 3 :45 a. m., she didn’t know whether he was drunk, intoxicated or just under the influence. Delora Bernstein said she thought he was intoxicated but not staggering, and that it appeared to her that he was just swaggering. To the three *696 nurses, 0 ’Reilly, Duncan and Shaw, he said he had just shot, killed or murdered his wife. Since each nurse gave a slightly different version, and since he repeated the statement, it is possible that he said all of these or that the nurses’ memories were not exact as to which word, “kill,” “shot,” or “murdered” was used. The jury was entitled to form its own opinion on this.
Murder—Intent—Intoxication
Defendant contends that the evidence is insufficient to support a conviction of murder because malice aforethought is a necessary element of the crime of murder; deliberate intent is required to have malice aforethought; intoxication may make a man incapable of such intent and the evidence here shows without contradiction that defendant was, during the period of the homicide, in such an extreme state of intoxication that his mind could not and did not form the intent necessary to constitute malice aforethought.
What we are really confronted with in this contention is whether or not the evidence shows such a degree of intoxication that as a matter of law defendant was, at the time of the homicide, incapable of forming the intent necessarily present in “malice aforethought” referred to in Penal Code section 187. (People v. Bjornsen, 79 Cal.App.2d 519, 530 [4, 5, 6] [180 P.2d 443] and authorities there cited; People v. Williams, 185 Cal.App.2d 457, 462, 463 [8] [8 Cal.Rptr. 254]; People v. Holt, 25 Cal.2d 59, 82 [9] [153 P.2d 21].)
Here, unlike most cases, we have a plethora of testimony, covering practically all of defendant’s alleged intoxication both before and after the homicide. Only a brief interval at the actual commission of the crime is not covered. The opinions of the witnesses run the full gamut from no observed intoxication through “under the influence” to “drunk.” Three things are clear, however: First, he had during the evening a considerable number of drinks of intoxicating liquor; his system had been somewhat acclimated to alcohol by previous years of heavy drinking; and at no time did any person observe that he could not walk, talk or understand what was said to him or what he himself was saying or doing.
Without attempting to recite all of the innumerable details showing his retention of mental and physical powers, coordination and understanding, we here note the following. He conversed in a coherent manner with all the witnesses; he exhibited a release of normal inhibitions against revealing his meanness of character in many ways, but always had sufficient *697 understanding to retreat from any force appearing to threaten serious harm to him; he moved around the neighborhood without physical difficulty; he planted the idea of his wife’s possible suicide in the minds of his neighbors a few minutes before the shooting; he sadistically accused his wife repeatedly of infidelity during the period prior to the shooting in order to “put her in her place,” but not because he believed the truth of his statements or implications and even though she refused to quarrel but just sat and cried, finally going to bed; he opened the closet and secured the rifle; he got out the shells, spilling some; he turned on the light to find them; he picked up all but one; he shot the victim in the spot where, from calculations he had previously expressed regarding game animals, was most apt to cause immediate death; he ejected the shell from the rifle as he went out the front door; he entered his car, drove around town, threw the rifle out in a back alley and returned to see if his victim was dead; finding her dead, he drove to the hospital to find Dr. Gregory, whom he claimed as a friend; he there threatened a nurse and put on a show of being drunk.
Some of these actions he denied or told differently, but the sum total of the evidence was ample for the jury to have reasonably believed them to be the true version. He told the officers after his arrest that he saw actual sexual intercourse between his wife and Callaway, which the jury could have believed was in an attempt to create sympathy and extenuating circumstances for himself. He says he turned the lights off and that the shot was an accident in the dark. The neighbor across the street says the lights were not turned out. The autopsy surgeons testified that the muzzle of the rifle was not more than 6 inches from the point where the bullet entered the neck when the rifle was fired. One doctor was of the opinion that the position of the burn from muzzle blast showed that the muzzle was actually against the neck, the muzzle blast burn proceeding upward (toward the head) from the point of bullet entrance, but no burn being apparent below (toward the body). This evidence, together with numerous other details was sufficient to support a conviction on the part of the jury that he deliberately, with full understanding of the nature and consequences of his act, and with malice aforethought, killed his wife.
“It is the trier of fact, not the appellate court, that must be convinced of a defendant’s guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier *698 of fact’s findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.” (People v. Robillard, 55 Cal.2d 88, 93 [1-2] [10 Cal.Rptr. 167, 358 P.2d 295] and authorities there cited.)
No other points on appeal are made. The attempted appeal from the order denying motion for new trial is dismissed as it is not here appealable, but is reviewed on appeal from the judgment.
The judgment is affirmed.
Coughlin, J., and Stone, J.,* concurred.
A petition for a rehearing was denied August 2, 1962.

 Assigned by Chairman of Judicial Council,