[Crim. No. 4293. In Bank.—July 16, 1940.]

THE PEOPLE, Respondent, v. THOMAS B. SMITH, Appellant.

Vernon F. Gant for Appellant.

Earl Warren, Attorney-General, J. Q. Brown, Deputy Attorney-General, Leslie A. Cleary, District Attorney, and William Zeff, Deputy District Attorney, for Respondent.

THE COURT.—After trial was had on an indictment which was returned by the grand jury of Stanislaus County, defendant was convicted of the crime of murder of the first degree. He had entered a double plea of not guilty and not guilty by reason of insanity, but later withdrew the latter plea. As the verdict which was returned by the jury was without recommendation, the court pronounced judgment of death against defendant. An automatic appeal from such judgment is now before this court.

The victim of defendant's crime was his wife, Grace Smith, who was thirty-two years of age. The crime was charged as having been committed on July 31, 1939. The parties had been married about ten years prior thereto. As a result of the marriage they had three small children, two girls and a boy, aged seven, five and three years, respectively. For some time prior to July 31, 1939, the parties had been having marital difficulties and, on or about July 10th, a divorce ac-

tion had been brought by the wife. As an outgrowth of that action a restraining order had been issued by the court, directed to defendant, by the terms of which he was precluded from disposing of certain property in his possession and prohibited from entering the premises occupied by his wife and children. At the time of the commission of the homicide, the deceased Grace Smith was living with the three children on a small ranch owned by her and located near the town of Hughson, California. Defendant was living at Crows Landing, California. He was fifty-nine years of age, and for several years prior to July, 1939, he had been employed as a section foreman by the Southern Pacific Railroad Company. It appears that on or about July 26th of that year defendant was discharged from the Southern Pacific Hospital in San Francisco where he had submitted himself for observation and medical treatment. For the next few days and until July 30th, defendant moved about considerably from one place to another in the vicinity of Stockton and Modesto. On the day following his discharge from the hospital, at Stockton he procured some $500 belonging to him and which he had theretofore left for safekeeping with an acquaintance in that city; on the same day, he arranged for a leave of absence from his employment; and, on July 28th, after one unsuccessful attempt in that regard he succeeded in borrowing a pistol-grip .410 gauge shotgun, stating at the time that he was going to the mountains for a few days ''on a hunting trip''. On July 29th, he went to Modesto and talked to the attorney whom he had engaged to represent him in the divorce proceedings. The following day in the early morning he left a handbag, in which he was carrying the gun, together with some personal effects, in the Square Deal saloon in Modesto, and went to the home of Mr. and Mrs. Crank, who were friends of defendant and his wife, and whose home was located on the outskirts of that city. The testimony showed that he spent several hours of that day at the Crank home and, according to the testimony of Mr. Crank, defendant talked a great deal about his domestic difficulties and complained about the restraining order that had been issued against him in connection with the divorce proceedings. Later in the day, on defendant's insistence that he do so, Mr. Crank, accompanied by his wife, went to the ranch home of Grace Smith to ask her if she would release the restraining order. During the period

of time they were absent on that mission, defendant went to the Square Deal saloon in Modesto and procured his handbag containing the gun, purchased a pint of whiskey and spent some time talking to different persons. He also made several visits to the Square Deal bar, at which times he had a ''few drinks of beer'', and on one such occasion he endeavored to learn from the bartender where he could exchange some .12 gauge shotgun shells—which defendant was then carrying in his pocket—for .410 gauge shells. Then, taking his handbag and the bottle of whiskey, he went back to the home of Mr. and. Mrs. Crank who, on their return from the Smith ranch, informed him that his wife had refused to consider the lifting of the restraining order, but that she had said she would meet defendant at her attorney's office in Modesto on the following day, July 31st, when, in accordance with arrangements theretofore known to defendant, a hearing with regard to the restraining order was scheduled to take place. Defendant spent the evening at the Crank home, and during the course of the evening each of the two men had a drink of whiskey from the pint bottle which defendant had purchased in the afternoon. About 11:30 that night defendant—having been invited to spend the night—went into the back yard of the Crank premises to a bed which was located under a tree, and which Mrs. Crank had prepared for his use. The evidence indicated that he did not occupy the bed, but that at approximately midnight he removed the gun from the handbag and, concealing it on his person, walked to the business district of the city of Modesto—consuming the remainder of the pint of whiskey on the way—and went to the Square Deal saloon, where he had a drink of beer and purchased two tins of aspirin. He testified that he then took four aspirin tablets, purchased another pint of whiskey and started to walk back toward the Crank residence; that he had walked but a short distance when he was given a ride in an automobile which was proceeding in the direction in which he was walking; that he did not alight at the place where he should have alighted to go to the Crank home but remained in the automobile until he reached a point near the town of Empire (which lies east of Modesto and in the general vicinity of the Smith ranch), where he left the automobile and proceeded to walk southward in the direction of the ranch home of Mrs. Smith; and that by shaping his route partially through fields and an or-

chard, he approached the ranch premises from the rear. On his arrival at a shed near the house, in accordance with his testimony, he took several more aspirin tablets and drank all but a small portion of the remaining whiskey (having drunk from the bottle and taken previous doses of aspirin on his way to the Smith home). And although defendant testified that he thereupon went to sleep, that when he awoke it was daylight and he then entered the house through the rear door,— from evidence of his footprints, together with a quantity of wood shavings found on the ground under the fig tree which was located at the rear of the premises, it appeared that defendant spent at least a portion of that interval of time occupied in "whittling", and that while under the tree he was practically concealed by its low-hanging branches.

At approximately 8 o'clock that morning, the two younger Smith children ran from the house and, according to the testimony of Mrs. Willis who lived across the road from the Smith ranch, the five-year-old girl exclaimed that her father had shot her mother. A few minutes thereafter, on entering the Smith home Mrs. Willis found the deceased lying on the floor near an ironing board, apparently unconscious and bleeding. It was discovered a short while later that she had a gunshot wound in her back near the left side. She died about 8:30 o'clock A. M. The pistol-grip gun which defendant had carried on his person to the Smith home lay on the floor near the body. One empty cartridge shell was found lying on the floor, another empty shell in the gun, and a pint bottle containing a small amount of whiskey of the brand purchased by defendant also lay near by.

The evidence showed that defendant had remained in the Smith house but a few moments, that on his way out of the house he deposited in the mail-box a document in his own handwriting which was in the nature of a will, and that he then walked along the road about a quarter of a mile southward to the home of Mr. and Mrs. Brazil. He had a brief conversation in the yard of the Brazil home with Mr. Brazil (who had died prior to the trial) following which the latter immediately hurried away in his automobile. Soon thereafter Mrs. Brazil found defendant lying on the ground outside the house groaning and repeating his wife's name. He then arose and in reply to her inquiry as to what had happened he told Mrs. Brazil that he had just killed his wife and that

he had tried to kill himself but that something "went wrong". (Subsequent events proved that at that time defendant had a gunshot wound in his abdomen.) Mrs. Brazil then walked to the Smith ranch accompanied by the seven-year-old daughter of the Smiths who had arrived at the Brazil home a few moments before defendant's arrival—the child having called, as was her custom, to obtain the morning supply of milk and to return a watchdog which belonged to the Brazils but which was loaned to Mrs. Smith at night and returned to the Brazil home each morning. After Mrs. Brazil's departure defendant proceeded to walk down the road in a direction opposite to the Smith home and toward the town of Hughson. He was apprehended along the way by a deputy sheriff who, on learning that defendant had been wounded, immediately proceeded to take him by automobile to a hospital in Modesto. The deputy sheriff testified that on the way to the hospital defendant stated to him in effect that he had been having family troubles and was "trying to end it all". Shortly after his arrival at the hospital defendant made a full and voluntary statement, in the presence of a deputy district attorney, a deputy sheriff and a shorthand reporter, in which he stated that he had just shot his wife and himself, and with considerable show of feeling complained of the fact that his wife had filed an action for divorce against him, and of her refusal to remove the restraining order.

At the trial, in addition to other evidence adduced by the prosecution, from which to a large extent the foregoing recital of facts is taken, the deposition of Mrs. Crank was introduced, in which she testified that about a week prior to the commission of the homicide, in discussing his marital difficulties defendant stated in her presence that he "ought to have killed her [his wife] long ago". However, the husband of Mrs. Crank, who assertedly was present on that occasion, testified that he did not remember hearing defendant make such a statement.

It was the theory of the prosecution that, in view of all the circumstances hereinbefore set forth, the jury was entitled to conclude that prior to the date of the commission of the homicide defendant had conceived the plan to kill his wife and to that end he had procured the gun on July 28th; that some time in the afternoon or evening of the day preceding the commission of the offense he had procured shells to fit

the gun; that thereafter by a circuitous route, and in the night-time, he had made his way to the home of his wife, where he lingered in the back yard until morning, and that after the watchdog had been taken away he entered the house, with the gun in his possession, and shot his wife in the back as she stood at the ironing board.

As opposed to that theory and in support of the contention of the defense that premeditation was not shown, defendant's testimony was as follows: That on the night preceding the commission of the homicide, he retired to the bed prepared for him in the back yard of the Crank home; that he found he could not sleep and decided to go to the business district of Modesto to procure some aspirin tablets; that he did not intend to go to the Smith ranch; that he took the gun with him because he had on his person a large sum of money; that on his return following his purchase of the aspirin and whiskey and after he had accepted the ride in the automobile he became engaged in a conversation with the driver of the car, and that instead of alighting at the point on the highway nearest the Crank home he "kept going" through inadvertence; that he alighted from the automobile near the town of Empire with the intention of going into the country near the town of "Le Grande" (La Grange) for the purpose of locating an area suitable for hunting and trapping which he contemplated doing later in the fall, but that, finding himself in the neighborhood of the Smith ranch, "on a sudden impulse" he decided to go there and sleep in the barn until morning, and then see his wife and children, obtain some equipment in connection with a fraternal order of which he was a member, and from there proceed on his journey "up in the hills". Defendant further testified that on the morning of July 31st, when he entered the ranch home of his wife, she was standing at an ironing board pressing some wearing apparel; that he exchanged friendly greetings with her and the two small children who were in the room with her; that as he stood beside her at the ironing board they had some conversation and he asked her to have the restraining order removed; that she replied that she did not think she should do so; that she then "mumbled something", and that he remembered nothing more until he awakened a few days later in the hospital. Defendant testified that he had suffered lapses of memory on former occasions, and he gave testimony to the

effect that after he had left the hospital in San Francisco on July 26th, on two different occasions during the ensuing three days he had found himself in a town or a place without any recollection of having arrived there. His adult daughter by a former marriage also testified that about a year previous to the time of the trial and while she was residing in defendant's home he returned from his work one evening and "flew into a sort of fit", beat her and threw her on the floor, and that the next morning he appeared to remember nothing of those circumstances. However, on cross-examination the daughter testified that defendant had struck her on other occasions.

Appellant contends that the verdict is not supported by the evidence; that the only evidence which tended to show premeditation was purely circumstantial, and that such evidence was as consistent with a theory of second degree murder as with that of murder of the first degree. In that regard appellant contends that, even if proof of the commission of a homicide was established, a portion of the testimony given by him tended to show that the crime amounted to no more than second degree murder. Under the state of the record, it may not be conceded that the only evidence pertaining to the question of premeditation was purely circumstantial, but even if such had been the case it would not necessarily follow that the verdict was in that respect without evidentiary support, since in homicide cases it is not necessary that there be express evidence of a deliberate purpose to take the life of another. It is sufficient if the facts and circumstances surrounding the commission of the offense reasonably warrant an inference to that effect. (*People* v. *Dale,* 7 Cal. (2d) 156, 159 [59 Pac. (2d) 1014]; *People* v. *Campos,* 10 Cal. App. (2d) 310, 315 [52 Pac. (2d) 251]; *People* v. *Mahatch,* 148 Cal. 200, 202 [82 Pac. 779]; *People* v. *Smith,* 25 Cal. App. (2d) 241, 244 [77 Pac. (2d) 277].) The evidence referred to by appellant as tending to show that the crime amounted to no more than second degree murder was a portion of the statement made by him at the county hospital, as hereinbefore referred to, which particular portion was to the effect that he had not theretofore planned to shoot his wife when he entered the Smith home on the morning of July 31st, but that while talking to her at that time he became so provoked by her attitude that, acting suddenly and on the spur of the moment, he shot her. Appellant argues that pre-

meditation would not be shown where a crime was committed under those circumstances, and that in such case the crime would amount to no more than second degree murder. ■ But the jury was not required to accept such portions of the evidence as might have tended to show lack of premeditation, when weighed against other evidence adduced to the contrary. The jury was justified in accepting such portions of defendant's testimony as appealed to it, and in rejecting those portions it did not believe. (*People* v. *Shaver*, 7 Cal. (2d) 586, 595 [61 Pac. (2d) 1170].) In addition, it is settled that there need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. (*People* v. *Donnelly*, 190 Cal. 57 [210 Pac. 523] ; *People* v. *Aranda*, 12 Cal. (2d) 307 [83 Pac. (2d) 928].) Moreover, the question of the degree of the crime is one exclusively for the determination of the jury and its conclusion in that respect will not be disturbed when there is any substantial evidence to support it. (*People* v. *Rico*, 180 Cal. 385 [181 Pac. 663] ; *People* v. *Mahatch*, 148 Cal. 200 [82 Pac. 779] ; *People* v. *McNeer*, 14 Cal. App. (2d) 22 [57 Pac. (2d) 1018] ; *People* v. *Wells*, 10 Cal. (2d) 610 [76 Pac. (2d) 493].)

■ Appellant's contention that the venue was not proven is without merit. Proof that the crime was committed in Stanislaus County was established by the uncontradicted evidence of at least two witnesses.

■ Likewise untenable is the contention that there was no proof of the cause of death of the deceased. No evidence was even sought to be introduced to show that her death resulted from any cause other than the gunshot wound. Under all the circumstances hereinbefore detailed it cannot seriously be contended that the deceased met her death from causes other than the firing of the bullet into her body.

■ Appellant also contends that the court erred in excluding from evidence four letters written by him to the deceased at different periods between July 19 and July 23, 1939. The letters were found among the effects of the deceased after her death. They were offered in evidence for the purpose of showing the state of mind of defendant with regard to his wife and family, and that he entertained a feeling of affection and concern toward his children and the deceased. The letters were written several days prior to the homicide and their

exclusion on the ground that they were self-serving, and hence inadmissible, was not improper. (See *People* v. *Chin Hane*, 108 Cal. 597, 604 [41 Pac. 697]; *People* v. *Pahner*, 10 Cal. App. (2d) 294, 301 [51 Pac. (2d) 1143]; *People* v. *Allen*, 166 Cal. 723, 730 [137 Pac. 1148]; *People* v. *Prather*, 120 Cal. 660, 664 [53 Pac. 259]; *People* v. *Huntington*, 8 Cal. App. 612, 621, 622 [97 Pac. 760]; Wharton's Crim. Ev., 11th ed., vol. 1, p. 791; *Hatfield* v. *Commonwealth*, 236 Ky. 754 [34 S. W. (2d) 241, 243].) Moreover, in view of the respective dates of the said letters they were remote and had no bearing on the state of defendant's mind at the time of the homicide.

Next it is urged by appellant that the court erred in permitting an excessive number of photographs of the body of the deceased to be received in evidence. They were four in number and they showed the body of the deceased as it appeared shortly after the homicide, when photographed from different angles. The condition of the body shortly after the homicide had been described by several witnesses, and the photographs merely portrayed facts which the jury was entitled to have placed before it. They possessed evidentiary value and tended to clarify the evidence theretofore presented by several witnesses concerning the position of the body in its relation to the gun and the other pertinent objects found on the floor after the homicide. The admission in evidence of the photographs was within the trial court's discretion, and clearly was not erroneous (*People* v. *Shaver*, 7 Cal. (2d) 586, 592 [61 Pac. (2d) 1170]; see, also, *People* v. *Gomez*, 209 Cal. 296, 300 [286 Pac. 998]; *People* v. *Burkhart*, 211 Cal. 726, 732 [297 Pac. 11]; *People* v. *Sisson*, 1 Cal. (2d) 510, 511 [36 Pac. (2d) 116]; *People* v. *Goodwin*, 9 Cal. (2d) 711, 714 [72 Pac. (2d) 551]; *People* v. *Rogers*, 163 Cal. 476, 480 [126 Pac. 143].) And in the light of the foregoing authorities the small number of photographs which were shown to the jury could not have prejudiced appellant's rights.

Appellant further contends that conflicting instructions were given to the jury with respect to the exercise of its discretion in fixing the penalty. His contention is that although two of such instructions were correct in that they told the jurors that with regard to that question they were "entirely free to act according to your [their] own judgment", another instruction which the court gave in that re-

spect was contrary to that language. The instruction last referred to is as follows:

"The Penal Code invests the jury in a criminal case for murder with the discretion, but the discretion is not an arbitrary one, and is limited to determining which of two punishments shall be inflicted, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed. If the evidence shows beyond all reasonable doubt the defendant to be guilty of murder in the first degree, but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder of first degree, and leave with the law the responsibility of affixing the punishment."

Appellant contends that by that instruction the jurors were told, erroneously, that their discretion is not an "arbitrary one" and that it is to be employed only when they are satisfied that the lighter penalty should be imposed. But in the case of *People* v. *Gosden,* 6 Cal. (2d) 14, 30 [56 Pac. (2d) 211], it was said, "The exclusive right of the jury in a criminal case to fix the punishment of a defendant found guilty of murder in the first degree either at life imprisonment or by death, is not an arbitrary right to be exercised by it without reference to or independent of the evidence in the case." (See, also, *People* v. *Rogers,* 163 Cal. 476, 483 [126 Pac. 143]; *People* v. *Reid,* 193 Cal. 491, 496 [225 Pac. 859]; *People* v. *Wolfgang,* 192 Cal. 754, 762 [221 Pac. 907].) Appellant objects in particular to the language used in the latter part of the instruction here complained of, that is, "If the evidence shows beyond all reasonable doubt the defendant to be guilty of murder in the first degree, but does not show some extenuating fact or circumstance, it is the duty of the jury to find a simple verdict of murder of first degree, and leave with the law the responsibility of affixing the punishment." However, in the Gosden case it was pointed out that in both the Rogers and Wolfgang cases, last above cited, an instruction which contained substantially the same language as that used in the latter part of the instruction here objected to was held not to have been erroneous. Likewise, the holding in the case entitled *People* v. *Goodwin,* 9 Cal. (2d) 711, 715 [72 Pac. (2d) 551], is to the same effect. In that case, with regard to a contention on the part of the appellant that the

district attorney had erred in his closing address to the jury by stating that "the penalty for murder of the first degree is capital punishment, unless there are circumstances of mitigation . . . ", the court said: "In a number of cases it has been held not to be erroneous for the trial court to instruct the jury, in substance, that the lighter sentence should be recommended only in the event mitigating circumstances were found to exist." It thus appears that in the instant case the particular instruction objected to was not erroneous and that appellant suffered no detriment by the giving of the assertedly conflicting instructions—particularly where the language of two of them was more liberal in scope than that of the more specific instruction last discussed.

On a review of the entire record, it is the conclusion of this court that the verdict and judgment are supported by the evidence, that appellant was accorded a fair trial, and that no prejudicial error was committed.

The judgment is affirmed.