[Crim. No. 4767. In Bank. Oct. 3, 1947.]

THE PEOPLE, Respondent, v. FREDERICK R. HILLS, Jr.,
Appellant.

Hahn, Ross & Goldstone, Sanford Simon, S. S. Hahn, Jerry Giesler and Ward Sullivan for Appellant.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

EDMONDS, J.—When charged with the crime of murder of the first degree, Frederick R. Hills, Jr., waived a trial by jury. He was convicted of that offense and the death sentence was imposed. His appeal from the judgment and from an order denying a new trial challenges these determinations principally upon the ground that the evidence is insufficient to support the conclusions of the trial judge in regard to his guilt.

The victim of the homicide was Doris Hills, the appellant's wife. She was described as being about 5 feet tall and weighing less than 100 pounds. At the time of her death, they were living together. The two sons of the couple had left the home of their parents but a daughter, with her husband and a small child, were members of the household.

It appears that Mr. and Mrs. Hills had a happy married life until about four years ago, when they quarreled over the marriage of their daughter, Carol, at the age of 16. Hills opposed her marriage but his wife gave the necessary consent. The argument was never forgotten and continued to be the cause of much bitterness between the parents.

Carol married a soldier and while he was away on military duty, she and her baby returned to the family home. When Carol's husband was discharged from the Army, he joined them and the three continued to live with Mr. and Mrs. Hills.

Difficulties between Carol and her husband accentuated the discord in the Hills' home, and a controversy between Mr. Hills and one of his sons added to the family disturbance. The son, Richard, tried to borrow money from his father to buy an automobile. Hills either did not have it or refused to make the loan and suggested that Richard obtain the necessary amount by selling his two motorcycles. Richard borrowed the money from a friend. The dispute caused hard feelings between Hills and his son, and Richard was ordered out of the home. He has lived with his aunt since that time.

There were other causes for inharmony. As a result of physical difficulties, for two or three years Mrs. Hills had been nervous and irritable, and she and her husband engaged in many discussions regarding the rearing of children. Apparently these arguments were unending.

Financial matters also brought about dissension. Hills closed a joint bank account which had been maintained by him and his wife and deposited the money in his own name. A quarrel followed, in which Hills claimed that his wife did not "know the value of a dollar," spent too much money and overdrew the account. Shortly before her death, Mrs. Hills inquired of an attorney in regard to her property rights in the event of a divorce. There was testimony that Hills knew of these inquiries, although at another time he denied any knowledge of them.

Hills admits that he killed his wife on a December night, but he has given several different versions as to the manner in which it was accomplished. However, the testimony of Carol, her husband, and Hills, is without conflict as to the events which preceded the homicide.

At the dinner table, Carol's baby was making considerable noise. Her husband told her to keep the baby quiet, which prompted Mrs. Hills to say, "Well, that sure is a heck of a way to bring up a kid," whereupon she walked out of the room. Hills went to milk the cows. When he returned, his wife was reading a magazine; Carol, her husband and the baby were in another room. The young people went to bed. Hills started reading a magazine and later asked his

wife why she had "jumped on" Carol's husband. She replied that she did not like him any more. There was some discussion about the other children. Hills then left the house to check the boiler in the greenhouse.

Upon his trial, Hills declared that, on his way back from checking the boiler, he was struck across the shoulders and did not know exactly what happened. According to his testimony, the next thing he remembered was seeing his wife lying on the floor of the shed. After turning on the light he tried to discover what had happened. Upon listening to her heart and not hearing any beat, he attempted to revive her by artificial respiration.

He then recalled that he walked up and down, wondering what to do next, and later dug a hole. Upon cross-examination he admitted burying his wife in this hole, which was in a squash patch. He then went to bed without awakening his daughter or her husband.

The next morning Carol prepared his breakfast. He asked her if she knew where her mother was, attempting to hide his distress from her. Later he and Carol went to friends in the neighborhood, asking if they knew anything about the whereabouts of Mrs. Hills. In his testimony, Hills admitted that he then knew his wife was dead and had been buried in the garden. But he declared that at times he suffered "black-outs," which were caused by a dusting powder used by him for killing bugs in the greenhouse. He attributed loss of memory as to just what had happened in the shed at the time he killed his wife to one of these "black-outs."

Two days after the homicide, Hills and Carol reported to the police that Mrs. Hills was missing. A report made by Richard, the son, was then on file, but Hills denied that he had any knowledge of it at that time.

It was more than a month after the crime was committed before Hills was questioned by the police. He then told them that, following his wife's "flare-up" at the dinner table, he had gone out to take care of the boiler. When he came back to the house, he went to bed and did not see Mrs. Hills again. He got up several times during the night to check the boiler; each time he came back the lights were still on and he did not see his wife. When asked if this was not unusual, he replied that she often read or sewed at night after he had gone to bed.

Some time later, he assisted the officers in searching the premises, but he did not lead them to the squash patch, nor indicate where his wife was buried. Although he then refused to take a lie detector test, he later submitted to one. But when he was informed that the result of the test was unsatisfactory, he declined to take another one. He placed his refusal upon the ground that the test hurt his chest and his heart troubled him.

The police did not visit him again for six months. They then went to his home at 10 o'clock at night and arrested him on a charge of suspicion of murder.

The next morning Hills refused to take the lie detector test, but after consultation with his attorneys he agreed to do so. The test was given by the inventor of the instrument and lasted for about two hours. The officers were not present, but at various intervals they were given reports as to its progress.

Following the test, Hills told the officers that he had killed his wife. As he related the circumstances to them, on the night of the crime he made several trips to the greenhouse to check the boiler. During the last of these visits, while he was in the greenhouse, to his great surprise, he was struck across the shoulders with an iron bar. He whirled around and grappled with the person, who was unknown to him at the time. He felt a fur coat, and losing his head, struck at the person several times. He realized that his assailant was a woman, he said, and he grabbed her by the throat. At that time he did not know that she was his wife. A few moments later she stopped struggling and was lying on the floor. He then recognized her as his wife and tried to revive her by artificial respiration. He thought she was dead and decided to bury her. He went out and got a shovel and buried her in the squash patch.

Hills indicated to the officers on a map where the body was buried, and told them he would show them the grave. They took him to his home and started digging at the place indicated by him.

A pair of brown oxfords and a pair of blue denim slacks were first discovered. Hills identified the shoes as belonging to his wife. Stockings were stuffed in the toes of the shoes. About a foot deeper, a decomposed body was found, clothed in a fur coat, a blouse, slacks, a man's type underwear and shorts. The body was without shoes or stockings. The grave was between 5 and 6 feet deep.

In a statement given by Hills at that time he repeated the story he had told before, but said that he did not know how long it took him to dig the grave, or to bury his wife; also that he did not recall throwing the shoes and slacks on top of the body. He was certain that he did not take anything from the house to put in the grave. He did not call his wife to come out there, nor did he go out to the greenhouse with her. As he and his wife had not quarreled in weeks, he had no idea why she would come out and strike him with an iron pipe. He also denied any knowledge of his wife's inquiries as to a divorce and a division of the property. When he realized what he had done, he stated, he thought it best to make it appear that she had left him.

Later, during this same statement, Hills said he was not sure whether he went to the house and got her shoes and slacks and threw them in the grave, but "it could be." He also told the officers that he did not have any quarrel with his wife in the house; they were sitting on the wrapping bench in the greenhouse and got to arguing and he choked her, but did not strike her. His wife had accompanied him when he went out to check the boiler. They were talking about Richard and she berated him for ordering Richard out of the house. This argument caused him to become so angry that he strangled her.

A few days later, in an interview with Dr. DeRiver, official psychiatrist of the Los Angeles Police Department, Hills said that he and his wife had an argument while they were in bed. When the boiler started smoking, he got up and dressed and his wife said that she was going with him to finish the argument. They came back through the greenhouse to the shed and sat on a bench and continued the argument, which was about Richard, for about half an hour. He then "blew his top." Hills had called Richard a "God damn bastard," and his wife said that her husband "was ten times that," so they started tussling. He grabbed her throat and choked her, while she was on the floor of the shed. He stated he "never let go" of her after he got hold of her throat. After the grave was partly dug, he went back to the shed and she was cold; he felt the coldness when he picked her up. He told Dr. De-Rivers that he did not know that he hated his wife; he did not believe that he had planned to kill her, nor did he think he intended to kill her.

The autopsy surgeon testified that because of the decomposed condition of the body, he was unable to give a definite cause of death. It was not certain that death was caused by manual strangulation; he could say that manual strangulation was present, but she may have died from suffocation. He explained that he had no way of knowing whether Mrs. Hills was dead when she was buried; it was possible that she was then still alive. Although there was no soil or dirt in what remained of the lungs, or in the chest cavity and bronchial tubes, it does not follow that she was dead at the time of burial because the soil, being moist, would not necessarily have been inhaled. Soil was found in the mouth and eyes, he said, but this would not necessarily be conclusive evidence that the person was buried alive. It would be possible for soil to be in the mouth whether the person was alive or dead when buried.

Upon this evidence the trial judge, sitting without a jury, convicted Hills of the crime of murder of the first degree and imposed the death sentence. As grounds for the reversal of the judgment, Hills maintains that although his wife may have been strangled, this could not be a circumstance tending to show premeditation or deliberation. He also asserts that it was error to admit his confessions and admissions in evidence as having been freely and voluntarily made. Finally, he argues that the record shows no crime of a degree greater than manslaughter.

To constitute murder of the first degree, there must be evidence showing that the killing was the result of a willful, deliberate and premeditated intent to kill, or was accomplished by means of poison, lying in wait, or by torture, or was committed in the perpetration of certain enumerated felonies. (Pen. Code, § 189.) The premeditated or deliberate intent, however, need not be shown by direct evidence, but "may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such a conclusion." (*People* v. *Eggers, ante,* p. 676 [185 P.2d 1]; *People* v. *Smith,* 15 Cal.2d 640, 647 [104 P.2d 510]; *People* v. *Cook,* 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Dale,* 7 Cal.2d 156, 159 [59 P.2d 1014]; *People* v. *Machuca,* 158 Cal. 62, 64 [109 P. 886]; *People* v. *Mahatch,* 148 Cal. 200, 202 [82 P. 779].) The drawing of the inference is a matter exclusively within the province of the jury, or of

the trial court when a jury trial has been waived. (*People* v. *Erno,* 195 Cal. 272, 279 [232 P. 710].)

It is not the province of this court to determine conflicts in the evidence, nor to choose between different inferences which reasonably may be drawn from the testimony. The sole question, so far as the admissible evidence is concerned, relates to its sufficiency to support the verdict. (*People* v. *Eggers, supra; People* v. *Holt,* 25 Cal.2d 59, 90 [153 P.2d 21].) The ultimate fact found by the trial court was that defendant was guilty of murder of the first degree. If there is substantial evidence in the record to support that judgment, the determination must be upheld. (*People* v. *Eggers, supra; People* v. *Holt, supra; People* v. *Smith, supra; People* v. *Wells,* 10 Cal.2d 610 [76 P.2d 493]; *People* v. *Rico,* 180 Cal. 385 [181 P. 663]; *People* v. *Mahatch, supra.*) And "[E]vidence of the means used might support an inference that the killing was willful, deliberate, and premeditated." (*People* v. *Bernard,* 28 Cal.2d 207, 211 [169 P.2d 636].)

Applying these rules to the record in this case, from the evidence as to the relationship between Hills and his wife, and other members of his family, up to the time of the homicide, the manner of accomplishing the killing, the means of disposing of the body, the efforts made to prevent its discovery, and his conduct both prior to and immediately after the crime was committed, a deliberate intention to kill is fairly deducible.

An appellate court's function is to correct errors of law; and where a jury has been waived, before the judgment may be set aside on appeal, it must clearly appear that upon no hypothesis is there sufficient evidence to support the conclusion reached by the trial court. The trier of fact is the sole judge of the weight and worth of the evidence. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631]; *People* v. *Latona,* 2 Cal.2d 714 [43 P.2d 260]; *People* v. *Tedesco,* 1 Cal.2d 211 [34 P.2d 467]; *People* v. *Tom Woo,* 181 Cal. 315 [184 P. 389].) "[I]t is a matter for the trial judge to be persuaded beyond a reasonable doubt and not this court." (*People* v. *Smith,* 35 Cal.App.2d 73, 76 [94 P.2d 633]; see, also, *People* v. *Newland, supra,* p. 682.) Clearly, from the record in the present case, the required showing of premeditation and deliberation between the intent to kill and the homicide reasonably may be inferred.

The cases relied upon by defendant are not controlling. In *People* v. *Kelley,* 208 Cal. 387 [281 P. 609], the circumstances tended to show an accidental or unpremeditated killing and were not sufficient to show a deliberate or premeditated intent. And in *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], the defendant's statement, showing his connection with the crime, indicated that the deceased was the aggressor in a quarrel which led to the homicide. If the defendant's statement was rejected as being untrue, the remaining evidence was insufficient to show that the intent was willful, premeditated, or deliberate. A deliberate intention may fairly be adduced, however, from the facts and circumstances surrounding the killing of Doris Hills.

 A "Memoranda of Decision" was filed by the trial judge in which he stated the conclusions which he had drawn from the evidence. His opinion does not constitute findings of fact and cannot be used to modify the judgment. (*Strudthoff* v. *Yates,* 28 Cal.2d 602, 615-616 [170 P.2d 873]; *DeCou* v. *Howell,* 190 Cal. 741, 751 [214 P. 444]; *Scholle* v. *Finnell,* 173 Cal. 372, 376 [159 P. 1179]; *Goldner* v. *Spencer,* 163 Cal. 317, 320 [125 P. 347].) But the credence which he gave to the testimony of Hills, and the inferences drawn from it and the evidence presented by the other witnesses, may be noted.

 He stated that there was ample evidence from which it could be found that Hills strangled his wife in the bedroom of their home and not in the shed; that the grave was prepared before the killing took place; and that she was still alive when buried. The motive for the homicide was said to be the belief of Hills that a divorce was inevitable and his unwillingness to give up any of the community property to his wife. The explanation of Hills as to a "black-out" was rejected, and the evidence was summarized as showing "nothing more nor less than a deliberately planned and premeditated murder which was carefully and craftily executed by this defendant."

This determination finds full support in the record. The testimony also justifies the conclusion of the trial judge that the confessions and extrajudicial statements made by Hills were not procured by either mental or physical coercion. Moreover, no objection to their introduction in evidence was made.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion fails to point to even a shred of evidence which might indicate that this homicide was premeditated. Indeed, it could not do so, for, as I read the record, there is no evidence, by way of inference or otherwise, of premeditation or deliberation. Although, as the majority opinion states, a premeditated or deliberate intent need not be shown by direct evidence, but "may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such a conclusion, and the drawing of the inference is a matter for the trier of the facts," nevertheless the facts or circumstances which furnish the "reasonable foundation" for the conclusion must be present. Here one may search the record in vain for them.

The majority opinion rests its conclusion merely upon the generalization that "from the evidence as to the relationship between Hills and his wife, and other members of his family, up to the time of the homicide, the manner of accomplishing the killing, the means of disposing of the body, the effort to prevent its discovery, and his conduct both prior to and immediately after the crime was committed, a deliberate intention to kill is fairly deducible."

The generalization means nothing. Every scintilla of evidence as to family relationship indicates that the killing must have been unpremeditated. Facts concerning the steadiness, good character, and loyalty of defendant in his family relationships abound in the record and there is no contrary showing. Some of these facts will be set forth later. As to the manner of killing and subsequent events, all indications point to the commission by defendant of an unplanned act, followed by an effort to protect the family by nondisclosure of the homicide.

Taking the elements mentioned in the above-quoted general statement one by one, the first is "evidence as to the relationship between Hills and his wife, and other members of his family, up to the time of the homicide." In the third paragraph of the majority opinion it is said that up to the time the couple differed over the marriage of their daughter, they apparently had a happy married life. Thereafter the home apparently became discordant. Nothing more is shown, however, than a period of general inharmony, such as has occurred at some time in many families. But even assuming that the discord was very aggravated, this would not be proof of

premeditation. The mere fact that the evidence might give rise to an inference that the family life was extremely inharmonious, could by no possible stretch of the imagination lay a reasonable foundation for further inferring that the murder was premeditated. If the rule were otherwise, every time motive is shown premeditation would necessarily be proven, but such is not the law.

The second element mentioned in the general statement of the majority is "the manner of accomplishing the killing." The evidence with respect to the manner of accomplishing the killing contains nothing upon which to base an inference of premeditation. Even if it be conceded that defendant strangled or choked his wife, that fact does not supply the element of premeditation, or of "torture" as that term is used in section 189 of the Penal Code (*People* v. *Bender,* 27 Cal.2d 164, 177 [163 P.2d 8]). The evidence shows no more than that defendant killed his wife and buried the body; it does not show deliberation or premeditation.

The next element mentioned in the general statement is the "means of disposing of the body." The only evidence with respect to disposition of the body is that defendant secretly buried it. Let this be so. The fact that a perpetrator of homicide buries the body of his victim does not show that the killing was premeditated. It merely shows an effort to conceal the homicide.

Lest it be inferred from the factual résumé in the majority opinion and its analysis of the testimony of the autopsy surgeon that there was a showing from which burial alive might be inferred, thus giving rise to a further inference of premeditation or deliberation, it must be pointed out that the analysis of that testimony is misleading and inaccurate. The majority opinion states, with respect to the testimony of the surgeon, that he was unable to give a definite cause of death; that "it was not certain that death was caused by manual strangulation; that he could not say that manual strangulation was present, but she may have died from suffocation. He explained that he had no way of knowing whether Mrs. Hills was dead when she was buried; it was possible that she was then still alive. Although there was no soil or dirt in what remained of the lungs, or in the chest cavity and bronchial tubes, it does not follow that she was dead at the time of burial because the soil, being moist, would not necessarily have been inhaled. Soil was found in the mouth and eyes, he said, but

this would not necessarily be conclusive evidence that the person was buried alive. It would be possible for soil to be in the mouth whether the person was alive or dead when buried.''

This résumé does not present the real purport of the testimony, which was that the surgeon could not state the cause of death and could not tell what the condition of the body was at time of burial. On direct examination he testified that the body was ''pretty well decomposed''; that he was unable to give ''a specific, definite cause of death,'' but that there were findings which suggested a cause. He then explained, ''Well, my conclusion as to the findings was this: this advanced state of decomposition of the body does not permit of the usual findings in asphyxia. However, the tearing and loosening of the fibrous tissue supporting the junction of the body of the hyoid bone and the major cornu on the right side, and the consequent abnormal mobility of the bone at this point is consistent with trauma due to external pressure with subsequent asphyxia.'' He testified that he found no evidence of disease or poison, no broken bones, or bullet wound.

On cross-examination the witness was asked, ''Q. Now, what was it that attracted your attention in this particular instance to the fact that there was a possible death by manual strangulation? A. Well, I don't recall exactly. I think it seems to be general information, perhaps, from the newspapers I might have read; I am not certain of that.'' In reply to the question, ''In other words, you found apparently no evidence of violence or force used in causing the death of the deceased, is that right, other than what you stated about strangulation?'' he answered, ''That is right, and the evidence in the region of the neck, there was no extended trauma on the right side. . . . The hyoid bone was not broken. . . .''

The surgeon was then questioned further respecting the looseness or mobility of the hyoid bone, and said: ''I feel that there was a great likelihood of pressure being exerted to bring about that looseness. Q. And you could not say with certainty that the cause of death then, in this particular case was due to manual strangulation, could you? A. All I could say is that particular finding is consistent with pressure over that area, strangulation type. Q. That isn't the question I asked you, Doctor. I asked you if you could state with certainty—and we are dealing with certainties here—that the

death in this particular case was caused by manual strangulation based upon your examination? A. No, I can't say that. I can only say that that was present, and if this person were alive at the time the pressure were exerted to bring about such changes, that it could very well and should have interfered with her breathing. I am unable to say, for example, whether or not this pressure could not have been brought about after the patient or this victim was dead. Q. But you do concede the difficulty in ascertaining the cause of death at all in this case because of the decomposition; isn't that correct? A. Yes, that is true.''

On redirect examination the question was asked, ''Doctor, could you determine from the condition of this body at the time you performed the autopsy if this woman was actually dead when she was buried, or she may have been buried alive? A. *I have actually no way of knowing.* Q. And she could have been buried while she was still alive? A. Well, I think it is possible.''

Thereafter, on recross-examination, the doctor stated that ''there was no dirt or soil in the mass of decomposed tissue that remained of the lungs,'' and that he did not recall finding any dirt in the eye sockets. It was then pointed out to him that his report stated that ''The face, neck and scalp has a large quantity of black, moist dirt over it, the dirt filling the eye sockets, ear openings and mouth,'' but he reiterated that ''there was no soil or dirt in the chest cavity or in the larger bronchial tubes or the lung tissue.''

He was then asked, ''Now ordinarily if a person was buried while still alive, there was some dirt, that would be inhaled through the bronchial system or in the body itself proper? A. Not necessarily. It varies. If the patient was conscious and struggling and if the soil were perhaps loose and dry, it is possible to get some of it deep into the lung tissue. . . . Q. Would you say, Doctor, that your findings here are consistent with only one finding as to the cause of death or inconsistent? A. I said it was consistent with asphyxia, but—what is your question again? Q. Would you say that your statement as to what the cause of death was here was consistent with no other finding? A. No, I didn't say that. I wouldn't say that.''

Thereafter, on redirect examination, the following testimony was given by the doctor: ''Well, suffocation is a form of asphyxiation. Asphyxiation is the general underlying

condition which is the interference with the absorption of air, oxygen, into the body. Q. And if a person was alive and buried and covered with wet soil, would they asphyxiate or suffocate? A. Yes, I would think so. Q. And you say you found soil in the mouth? And the eyes? A. Yes. Q. And that would be consistent with the finding that the person was alive when buried, would it not? A. Not necessarily. If this person were dead and had his mouth open, soil could go in. Q. But he also could do that if he was alive? A. That is right.''

The matter was made even clearer on recross-examination. ''Q. Well, now, Doctor, just a minute here. You stated a moment ago that in your professional opinion that the cause of death was due to a trauma which was an injury to the hyoid bone. Now, if that occurred prior to the time that the body was placed in the grave, then the person would have been dead at the time, would they not? A. Well, not necessarily. The person might have been dead. The person might be asphyxiated and live a short time in that state of asphyxia. Q. *You would have no way of determining that, whether death took place while the body was being placed in the grave or at the time?* A. *No, I wouldn't.''*

Although the doctor indulged in some speculation under the prod of the examiner, from his testimony as a whole and under any fair analysis of his statements, it is obvious that the purport was just this, and nothing more: That because of the decomposed condition of the body, he could not give the cause of death; that a loosened condition of the hyoid bone was consistent with death by strangulation; that he had no way of knowing whether the victim was dead or alive when buried; and that the presence of dirt in the face openings did not indicate a burial alive any more than it did a burial after death.

Such evidence affords no reasonable foundation for drawing an inference that the victim was buried alive and therefore the homicide must have been premeditated. The mere fact that a body has been buried and decomposed does not of itself give rise to the conflicting inferences that the deceased was alive or that he was dead when buried, any more than it could be inferred from the mere happening of an accident causing personal injury, either that the injured was negligent or that he was not negligent.

Certainly it is a wrong, terrible and irretrievable, to impose the death penalty merely because the burial and decomposi-

tion of the body of the victim makes it impossible to determine whether she could have been buried alive, and therefore the trier of the facts decides to infer a burial alive and from that doubtful inference draws the further inference of premeditation. The wrong is even more glaring when it is considered that in reply to the question: "Could you determine . . . if this woman was actually dead when she was buried, or she may have been buried alive?" the surgeon replied, "I have actually no way of knowing." If the prosecution's expert witness had no way of knowing the fact and refused to commit himself to even an inference, surely it was not for the court to draw the inference, and from it a further inference of premeditation, and on this foundation impose the extreme penalty. Indeed, since the expert testimony was uncontradicted, the court was bound to conclude that the inference could not reasonably be drawn.

The majority opinion refers to the statement of the doctor in reply to the question, "And she could have been buried while she was still alive?" "A. Well, I think it is possible." But this answer did not qualify his other frank admissions that actually he had no way of knowing the fact. History is replete with cases of suspended animation where persons have unwittingly been buried alive, and the possibility therefore exists in any instance where burial follows close upon a supposed death. But defendant testified, and his statement was not shaken, that he thought his wife was dead when he buried her, and the expert refused to draw any inference to the contrary.

The next element mentioned in the general statement in the majority opinion is "the effort to prevent its discovery"; that is, the effort to conceal the crime. Certainly the fact that a perpetrator of homicide tries to conceal what he has done does not show premeditation. This is too obvious to require further comment. In fact, the natural reaction of a husband and father to an unintentional killing of his wife might be to protect the family by keeping the circumstances from public disclosure. In other words, he would be as apt to make an effort at concealment in the case of an unpremeditated killing as in the case of a planned murder.

Lastly, the general statement mentions defendant's conduct "both prior to and immediately after the crime was committed." The reference to the showing as to conduct before the crime was committed may be intended to point

to inharmony in the home, which has already been mentioned, or perhaps to the suggestion of financial differences, although the sum involved in such differences, if any there were, was so insignificant and the showing on the subject so meager as to carry no weight. But even if it be conceded that there were financial differences, suggestions of divorce, quarrels, and the like, these alone do not constitute any evidence whatsoever of a premeditated killing. Let the fact be admitted that Mrs. Hills was nervous and irritable; that she had arguments with defendant respecting the children; that at dinner on the day of the homicide she left the room saying, ''Well, that sure is a heck of a way to bring up a kid''; and that she and defendant later argued hotly in the greenhouse. How does this prove the killing to have been premeditated? It simply shows no more than discord in the family or possible motive for the crime.

Defendant's conduct immediately after the crime was committed shows beyond doubt an effort at concealment. But evidence of concealment is not evidence from which to infer premeditation. The fact of the matter is that the evidence contains no proof whatsover of premeditation and the writer of the majority opinion has not been able to put his finger on even one single circumstance which points to that element and so has taken refuge in the generalization above discussed.

The record shows clearly an attempt on the part of the trial court to make out a case of premeditation and deliberation where none exists. The evidence is sufficient only to establish that the homicide was murder; it is insufficient to establish that the murder was deliberate and premeditated. But the asserted prejudicial errors relate solely to the degree of the crime and do not warrant a reversal if the judgment is reduced to an adjudication of murder of the second degree. It is therefore my opinion that pursuant to the power vested in this court by section 1181 of the Penal Code, the judgment should be reduced to impose the penalty prescribed by law for murder of the second degree and that, as so modified, the judgment should be affirmed. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21].) The following full résumé of the facts and discussion of the law points presented by this appeal will demonstrate the soundness of this conclusion:

Defendant, who is about 43 years of age, has lived in Los Angeles since his fourth year. In 1923, when he was 19 years

old, he married a girl of the same age, and they had three children, William, who is now about 22 years old and served in the Navy during the World War, Richard, now about 21, who served in the Merchant Marine, and Carol, who is about 19.

Defendant always made ample provision for his family. He was a nurseryman of grade school education. For twenty years the family had lived on acreage used for the nursery, located near Van Nuys. During the war defendant not only kept up his nursery but also worked a night shift in the Lockheed Aircraft plant, thus working 14 to 15 hours a day.

According to testimony of the children, the marriage of their parents seemed always happy, the home serene, and relations with friends and in-laws were harmonious. However, during the war years the wife worried over the children. She was small and frail, had had several operations, and while suffering from the menopause she became unusually nervous and irritable. Defendant, a soft-spoken man, apparently was patient with her, but he strongly opposed her attitude on certain problems concerning the children. Marked differences between the two arose when, at the age of 15, the daughter Carol wanted to marry a soldier. Both parents, and particularly defendant, objected because of her youth, but when she became 16 the wife yielded and attended the marriage. Feelings aroused by the arguments had over this event were never wiped out.

After a child was born to Carol she came to live with her parents and when her husband was discharged from the service, he joined the family. Their married life was unhappy and Carol later sued for divorce. Defendant was continually annoyed by his wife's criticisms of the way Carol and her husband were raising their child. Defendant's long hours of work, combined with problems over the children and his wife's irritability, created an inharmonious situation in the home. In addition, defendant had a difference with the son Richard over a loan requested for the purchase of a car. He ordered the boy from the house but the wife remained friendly with him and continued to see him.

At some time during this unsettled period defendant inherited the nursery acreage from his mother, but the estate of the mother was not closed. For some reason, perhaps because he thought it would aid a plan to close the estate or because he thought his wife might secretly give money to the

children or otherwise misuse joint funds, defendant changed the joint bank account which he had with his wife to an account in his own name. There is some evidence that the wife knew of this. Defendant also discussed with the nursery foreman turning the business over to him for awhile so he and his wife could take a vacation together. The wife had inquired of an attorney concerning her property rights in event of divorce, telling the attorney that defendant and the son Richard were not friendly. She admitted that there was not a ground for divorce. The attorney suggested that he talk with defendant, because the matter seemed to be very minor, and to this the wife agreed. Defendant at one time denied and at another admitted that he knew of the visit to the attorney. He claimed he did not know the wife was told that she was entitled to half of the community property.

The nursery contained a greenhouse, lath house, other outbuildings, and a large 17-year-old boiler house to heat the greenhouse. Defendant was running this boiler about 12 hours out of each 24. It had to be checked at night one or more times and had been giving trouble.

At dinner on December 7, 1945, the grandchild cried and her parents tried to quiet her. Nevertheless, defendant's wife made a critical remark and left the room. Defendant went out to milk the cows. When he returned he and his wife had a discussion or argument about the children. Defendant then went to let the cows out and to check the boiler. About 9 o'clock the children and grandchild went to bed and the wife prepared for bed.

At breakfast the following morning the wife did not appear and defendant inquired of his daughter as to her whereabouts. She could not thereafter be found. Neither the daughter nor her husband had heard any disturbance in the night. Inquiry was made of friends and relatives, and defendant apparently encouraged this. Finally the police were called and later investigators from the district attorney's office took up the search.

Defendant was interrogated at his home on January 14, 1946, and again on January 17th and 18th. The premises were searched and defendant was asked to take a lie detector test. He told the officers that after going to bed, he arose and checked the boiler two or three times on the night of his wife's disappearance; that the light was on in another room each time he came back to the house, but he did not see his

wife; that it was not unusual for her to read or sew at night, and for him to go to bed; that the next morning he asked where she was. Defendant at first told the officers that he would not take the lie detector test, but later consented and went to the crime laboratory the afternoon of January 18th. On January 19th, the police told defendant the test was unsatisfactory and asked him to take another. Defendant refused on the ground that it hurt his chest and his heart troubled him.

The next visit from the police was five months later, June 19th. They called on defendant at 10 o'clock at night and said they would like to have him go with them. At the police station he was booked on suspicion of murder. He was taken to the crime laboratory about 9 or, 9:30 the next morning, June 20th. The inventor of the lie detector machine was there from Chicago. Defendant declined to take a test. Between 4 and 4:30 in the afternoon his counsel arrived and refused to advise defendant to take the test. About 8 in the evening the inventor of the machine returned and at that time defendant consented to a test. It was given by the inventor at 10-minute intervals between which he reported his progress to the officers. It lasted until 10 o'clock.

At that time defendant told the officers to take him home and he would show them where the body of his wife was buried. He said that on the evening of December 7, 1945, he had made several trips from the house to the nursery to fix the boiler; that as he was coming back through the greenhouse he was struck across the shoulders with an iron bar; that he grappled with his unknown assailant and felt a fur coat; that he realized it was a woman and found that he had strangled his wife; that he tried to revive her with artificial respiration but was unsuccessful; and that he then proceeded to bury her in a spot where the ground was soft.

The officers returned home with defendant and started to dig at a place indicated by him. They uncovered a pair of shoes which had belonged to the wife with stockings stuffed in the toes and a pair of slacks. About a foot deeper they unearthed her decomposed body clothed in a fur coat, a man's type of underwear and shorts, a blouse, and slacks. The officers then returned to their automobile and there took a more detailed statement from defendant. Defendant stated he did not know how long it took him to complete the burial and that he had no idea why his wife struck him. He made

inconclusive statements on the question whether he went back into the house for his wife's clothes and threw them in the grave before completing it. He did say that when he realized what he had done, he thought it best to make it appear that his wife had gone away.

After this statement was taken, the officers drove defendant to San Fernando for breakfast. About 5 in the morning, June 21st, they returned defendant to his home and there questioned him further. He was again interviewed between 9:30 a. m. and 12:45 p. m. at the Van Nuys City Jail. Some of his statements in these several interviews or confessions were contradictory; for example, whether he and his wife were arguing when he went outside, and she went with him to complete the argument, or whether she came out unexpectedly. In the main, however, defendant adhered to his original story of being struck in the greenhouse unaware and grappling with an unknown assailant. He insisted throughout that he had no intention of injuring his wife and was appalled when he found he could not revive her. At the trial he took the witness stand in his own behalf and for the first time advanced the further information that he remembered nothing between the time he was struck across the shoulders and the time he saw his wife lying on the floor; that he experienced a black-out, similar to others previously suffered by him, caused by a certain dusting powder used to kill bugs. He recalled trying to revive his wife, but only partially recalled the burial.

The trial court found that the several confessions and statements of defendant were freely and voluntarily made. They were received in evidence without objection by his counsel, but defendant testified that they had been procured by mental and physical coercion practiced upon him by the police officials. However, the evidence sufficiently supports the trial court's finding on the subject.

As a motive for the crime, the trial court stated he believed that defendant knew that a separation from his wife was inevitable and that rather than give his wife any property, defendant thought that the most expeditious way for him to handle the matter was to kill her; that he loved his money and property more than he did the woman who had been his helpmate and companion for more than 25 years. The contention that this finding lacks evidentiary support must be sustained. There is no evidence of inevitability of separation.

On the contrary, the evidence is to the effect that defendant and his wife planned to take a vacation trip together and that the wife knew when she visited the attorney that she had no ground for divorce. The change in the bank account was made a number of months prior to the killing, and apparently involved the transfer of only a small sum of money. Members of the family testified that defendant was generous with her in regard to money matters. The property which defendant was to inherit from his mother would become his separate property. So far as the evidence shows, defendant's arguments with his wife concerned only problems relating to the welfare of the children.

The trial court refused to credit defendant's testimony that he suffered a "black-out" which wiped out certain details concerning the circumstances of the killing. The evidence justifies the court's rejection of this theory.

The court found defendant's contention that he was guilty of nothing but manslaughter to be untenable, and in this connection stated that the evidence shows that the wife was not killed without malice during a sudden quarrel or heat of passion; that defendant's testimony was that he and his wife had not been quarreling; that no gun was used but the victim was strangled by defendant; that the court believed that the wife was killed in her bedroom and not out in the lath house as contended by defendant; that one could readily conclude that the wife was alive when she was placed in her grave; that it might be readily inferred that other people in the home knew something of the killing; that it is unlikely that they could not and did not hear what was taking place.

The court further stated that there is ample circumstantial evidence which would substantiate the belief that this defendant had already prepared the grave, 5 or 6 feet in depth, before the killing took place, and that it was his conclusion that the homicide was nothing more or less than a deliberately planned and premeditated murder which was carefully and craftily executed by defendant, a murder in the first degree.

The finding that defendant was guilty of a crime greater than manslaughter has sufficient evidentiary support. The absence of any evidence of a "considerable provocation" (Pen. Code, § 188), sufficient to reduce the offense to manslaughter, and the evidence that the deceased was strangled supports the trial court's conclusion that defendant acted with malice aforethought, that is, that the "circumstances

attending the killing show an abandoned and malignant heart" (Pen. Code, §§ 187, 188; *People* v. *Bender, supra,* 27 Cal.2d at p. 178).

The further finding that the homicide was nothing more or less than a deliberately planned and premeditated murder which was carefully and craftily executed by defendant, a murder of the first degree, lacks support because of the absence of any evidence from which it may reasonably be inferred that the killing was "willful, deliberate, and premeditated" within the meaning of section 189 of the Penal Code. Only where there is evidence that the "intention unlawfully to take away the life of a fellow creature," was a considered intent arrived at or carried out as the result of deliberation and premeditation, can the murder be that of the first degree. Where the evidence merely establishes that there was no considerable provocation and that the defendant acted with "an abandoned and malignant heart," "malice" may be "implied," and the murder is that of the second degree. (Pen. Code, § 189; *People* v. *Bender, supra,* 27 Cal.2d at p. 178; *People* v. *Holt, supra,* 25 Cal.2d 59, 87, 90; *People* v. *Thomas,* 25 Cal.2d 880, 901 [156 P.2d 7].)

In an effort to find support for the trial court's conclusion that the killing was deliberate and premeditated, and therefore of the first degree, the attorney general refers to the trial court's stated belief that the wife was killed in her bedroom and was alive when placed in the previously prepared grave. But no evidence was adduced of such facts, nor is there to be found in the evidence any basis for such a belief or inference on the part of the trial court. The only evidence relative to the manner in which the killing was accomplished, other than conditions shown by the opening of the grave, is that contained in the statements of defendant. He consistently maintained the position that he had no intention of hurting his wife; that she was strangled outside the house; and that after he found that his efforts to revive her were unavailing, he dug the grave.

The trial court's belief that the wife was killed in the bedroom and not in the lath house is said by the attorney general to be a reasonable inference which the court could have drawn from the fact that when the grave was opened, shoes and stockings were found first, and underneath them, the clothed body with the feet bare. It is argued that the deceased would not have come out to the lath house in bare

feet. Defendant could not recall taking off his wife's slippers after the killing, and stated that she usually wore slippers or shoes. He had no recollection of what actually occurred. If defendant had slain his wife in the bedroom and thereafter clothed her body, it is unlikely he would have overlooked putting on shoes and stockings. He may have removed shoes and stockings with some idea of preparing the body for burial, and then abandoned the idea. Although the court stated that it might be readily inferred that the other people in the home knew something about the killing, the testimony of members of the family was that any noise in the bedroom could have been heard clearly in other parts of the house. The daughter Carol testified that she went to bed about 9 o'clock and stayed in the room all night with her husband and baby; that any screams by her mother could have been heard, or any noisy moving about; that no sound emanated from her mother's room. Certainly, if the mother had called for help, the natural reaction of the daughter would have been to rush to her assistance. In short, the only direct evidence, and the inference reasonably to be drawn from that evidence, is that the killing took place beyond earshot and outside the house. Moreover, from an inference that the crime was committed in the bedroom it would not necessarily follow that the killing was deliberate and premeditated. Furthermore, if the wife was killed in the bedroom, as the court found, she could not, as the court further found, have been buried alive.

The court's stated belief that one could readily conclude that the wife was alive when placed in the grave apparently grew out of a misconception of the purport of testimony given by the autopsy surgeon. His examination was hampered by the decomposition of the victim's body, but he stated that he found soil in the mouth and eyes. Asked the question "And that would be consistent with the finding that the person was alive when buried would it not?" he replied, "Not necessarily. If this person were dead and had his mouth open, soil could go in." He also admitted that he had no way of determining whether death took place while the body was being placed in the grave. In other words, the plain purport of this testimony was that nothing in the conditions found by him showed either that the victim was or was not still living when placed in her grave. Such testimony, coupled with the only other evidence on the subject, defendant's statement that the wife was dead when he buried

her, does not give rise to an inference that she was buried alive. The only reasonable inference is that she was dead. It finds support in the surgeon's further statement that if a victim is conscious and struggling when buried and the soil is loose and dry, it is possible for soil to get deep into lung tissue, but that the soil in which the deceased was buried seemed moist and no dirt was found in the mass of decomposed lung tissue; also, that the conditions found were consistent with strangulation type pressure. In short, the surgeon could only say that under the conditions in the body found by him, death could or could not have been caused by manual strangulation or suffocation, and he had no way of determining whether death took place while the body was being placed in the grave. Such testimony affords no basis for an inference that the deceased was buried alive and therefore the killing must have been premeditated.

The court's further expressed belief that defendant had prepared the grave before the killing took place stems in part from his belief that the deceased was buried alive, for if such were the fact, naturally the grave would have been prepared prior to death. It also appears from the court's emphasis of the depth of the hole that he believed that defendant did not have time and strength to dig a 5 to 6-foot grave after the killing. Defendant, however, stated that he dug the grave after his efforts to resuscitate his wife failed, and there is no contradictory evidence. He stated he "probably" chose the particular site because the ground was soft. He was a man in the prime of life, hardened to 14 or 15 hours a day of manual labor, and experienced through his nursery work in ground conditions and digging. He was not pressed for time and it cannot reasonably be inferred that it was not physically possible for him to have completed the grave between the time of the murder and daylight.

The record shows no inconsistency between the physical facts proved and the uncontradicted statements of defendant. These statements adhered consistently to the fact that defendant did not want or plan to hurt his wife; that he was appalled when he found what he had done; and that he made every effort to revive her. They find support in the testimony given by friends and members of the family regarding defendant's family relations and the steadiness of his character and conduct over a long period of years. No proof was ad-

duced from which it might reasonably be inferred that the killing was deliberate or premeditated.

In considering the effect of the evidence it was the duty of the trial court "to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion" (*People* v. *Holt*, 25 Cal.2d 59, 90 [153 P.2d 21]). "Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof. An inference must be 'warranted by a consideration of the usual propensities or passions of men, [or] the particular propensities or passions of the person whose act is in question. . . .' (Code of Civ. Proc., § 1960.)" (*People* v. *Bender, supra,* 27 Cal.2d at p. 186.)

Because of the lack of any substantial evidence from which it reasonably can be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation, in the ordinary meaning of those words, the judgment based upon the finding of murder of the first degree cannot be sustained. The evidence, however, sufficiently supports the other findings of the trial court, and establishes the homicide as a murder of the second degree.

It is my opinion, therefore, that the judgment should be modified by reducing it to murder of the second degree and as so modified, it should be affirmed. The cause should be remanded to the trial court with directions to pronounce judgment on defendant sentencing him to imprisonment in a state prison for the term prescribed by law for murder of the second degree.

Traynor, J., and Schauer, J., concurred.

Appellant's petition for a rehearing was denied October 27, 1947. Carter, J., Traynor, J., and Schauer, J., voted for a rehearing.